The Chief Justice
 

 delivered the opinion of the court.
 

 This is a writ of error to a judgment rendered in the circuit court of the district of Columbia, sitting in Alexandria on the following case.
 

 A charter party was entered into between the parties on the tenth day of April, 1798, whereby Groverman let to Hooe and co. a vessel, of which he was owner, for a voyage to Havre de Grace.
 

 The firft article states the indenture to witnefs, “ that “ the said Groverman hath granted and to freight letten “ to the said R. T. Hooe and co. the brigantine Nancy, “ whereof he is owner, commanded by James Davidson, a " citizen of the United States, now lying in the port of “ Alexandria, of the burthen of 197 tons, or thereabouts; “ and for and in confideration of the covenants herein “ after mentioned, doth grant and to freight let unto the “ said R. T. Hooe and co. their executors and adminis- " trators, the whole
 
 tonnage
 
 of the aforesaid vessel called “ the Nancy, from the port of Alexandria, in Virginia, to “ the port of Havre de Grace, in France, and back to the “ said port of Alexandria,
 
 in a voyage to be made by the said
 
 “
 
 R. T. Hooe and co.
 
 with the said brigantine, in manner " herein after mentioned ; that is to fay, to fail with the
 
 *230
 
 “ first fair wind and weather that shall happen after she is “ completely laden, from the said port of Alexandria, with " cargo of tobacco to be shipped by said R. T. Hooe and " co. to the said port of Havre de Grace, and there de- “ town, merchants, or to their assigns, in good order, the “ danger of the seas only excepted ; and at the said port “ of Havre de Grace to take on board a full freight or “ lading of such goods as the said Andrews and co. may " think proper to put on board said brigantine, as a return " cargo, with which the said vessel is to make the best of “ her way directly back to the port of Alexandria, and “ there safely deliver such cargo to the said R. T. Hooe “ and co.”
 

 Groverman further covenants with the said R. T. Hooe and co. that the vessel is and shall, during the voyage, be kept in good condition, and furnished with all manner of necessary and proper rigging, &c. and with mariners to navigate her. He further covenants to allow twenty-five running days for lading the vessel at the port of Alexandria, thirty days for discharging her cargo and taking on board the return cargo at Havre, and ten days for receiving her inward cargo at Alexandria.
 

 In consideration of these covenants, R. T. Hooe and co. engage to pay the stipulated freight, and £.8. 8. o. for every day’s demurrage, if any there should be by their default at the port of Alexandria ; and one hundred and fifty-one livres by the day for every day’s demurrage, occasioned by their default at the port of Havre de Grace.
 

 On the 11th day of April provisional articles were entered into between the same parties by which it was stipulated, that,
 

 1st. “ The captain or commander shall be instructed “ by his owner, previous to his sailing from Alexandria,
 
 “ to
 
 touch at Falmouth in such manner as shall appear “ to his crew, that there was a necessity for his so doing, “ there to lay off and on twenty-four hours (or longer if " desired) in day light, during which time there will come “ off orders from Mr. Fox, the American consul, Mr. “ Thomas Wilson of London, or Messrs. Andrews and " co. of Havre de Grace.
 

 
 *231
 
 2dly. " On receiving these orders the captain or com- " mander must proceed directly for Havre de Grace, Lon- " don, Hamburg, Bremen or Rotterdam, as he may be di- “ rected, and at one of these ports deliver his cargo, to “ such person or persons as the aforesaid orders may di- “ rect.”
 

 The third and fourth articles apply the covenants of the charter party, respecting the conduct of the vessel in the port of Havre, to the contingency of her being ordered to some other port; and to the freight, and stipulate the demurrage to be
 
 £. 6. 6.
 
 0. sterling by the day.
 

 The fifth article is in these words.
 

 5th. “ If the vessel is detained over twenty-four hours at " Falmouth, demurrage shall be paid for the time at the " rate stipulated in the charter party.” On the 20th of June, 1798, the vessel arrived in Falmouth roads about three leagues from the port of Falmouth, where the master laid her to and immediately went on shore, and applied to Mr. Fox, the American consul, for orders where to proceed. Fox replied that he had received no orders for him and that therefore he must bring the vessel into the port of Falmouth, and there remain until orders were received for him to proceed to his port of discharge.
 

 These orders were given to avoid the penalties of the British hovering act, which subjected to forfeiture the vessel and cargo if found in the situation in which the Nancy would have been, if the had waited for orders without entering the port. The captain immediately brought his vessel into port where she was seized on suspicion of being French property, and detained for nearly three months.
 

 After the seizure, on the 23d day of June, the captain received orders from Thomas Wilson, through Fox, to proceed with his vessel to London, there to deliver her cargo.
 

 This suit is brought by Groverman to recover damages against R. T. Hooe and co. for this detention.
 

 The declaration states the charter party and provisional agreement, and then assigns a breach of them in these
 
 *232
 
 words. “And the said plaintiff doth aver that the said brig " arrived off Falmouth on the 19th day of June, 1798, " when the captain, by the orders of the aforesaid Mr. " Fox, the agent of the said defendants, conveyed her into " the port of Falmouth, by means whereof the said brig “ was detained in the aforesaid port of Falmouth, more than “ twenty-four hours, to wit, from the 20th day of June last “ aforesaid, to the 11th day of September in the year 1798, “ when she failed by the orders of Andrews and co. the “ agents for the said defendants, for the Downs.” And the declaration then charges that the defendant had not paid the demurrage stipulated in the charter party, or in the provisional articles.
 

 Issue was joined on the plea of conditions performed, and the jury found a special verdict, containing the facts already stated, and further, that before the vessel sailed from Alexandria the captain was told by R. T. Hooe, that on his arrival off Falmouth he would receive instructions from Mr. Fox, the American consul, and that he must abide by such instructions; and that it was by the default of the defendants or their agents in sailing to have orders ready on the arrival of the said vessel off Falmouth as aforesaid, designating and directing to which of the ports of discharge mentioned in the second article of the provisional articles aforesaid, the said vessel was to proceed, and by the orders given to the said Davidson, (the master) by the said Mr. Fox, that the said Davidson did bring the said vessel to anchor in the said port of Falmouth, and that the said vessel and cargo were subjected to the seizure and detention aforesaid; if the law be for the plaintiff the jury find £.794. 19. 9. Virginia currency, damages; if the law be for the defendant, then they find for the defendants.
 

 The circuit court was of opinion the law was for the plaintiff and rendered judgment in his favor.
 

 To support this judgment the special verdict ought to shew that R. T. Hooe and co. the defendants in the circuit court, have broken some covenant contained in the agreements between the parties; and that the breaches assigned in the declaration are upon the covenant so broken.
 

 
 *233
 
 The breach assigned is the non-payment of demurrage stipulated to be paid, for a longer detention than twenty-four hours at Falmouth ; and it is to be enquired whether the declaration makes a case showing demurrage to be demandable, and how far the special verdict sustains that case.
 

 The case made by the declaration is,
 

 That on the arrival of the vessel off Falmouth the captain took her into port by order of Mr. Fox, by means whereof she was detained more than twenty-four hours.
 

 The question arising out of this case for the consideration of the court, is,
 

 Does it shew a breach of covenant on the part of R. T. Hooe and co. which subjects them to demurrage for the detention stated ?
 

 The fifth article is supposed to be broken. The words of the covenant are, “ if the vessel is detained over 24 “ hours at Falmouth, demurrage shall be paid for the “ time, at the rate stipulated in the charter-party." If this clause provides for every detention whatever, however it may be occasioned, the enquiry is at an end, and the judgment should be affirmed. But on looking into the provisional articles, the general expressions, here used, will be found to be explained.
 

 The first of these articles stipulates that the captain should touch at Falmouth, there to lay off and on for twenty-four hours (or longer if desired) in day light, during which time there will come off orders from Mr. Fox the American consul, Mr. Thomas Wilson of London, or Messrs. Andrews and co. of Havre de Grace.
 

 Here then is a power given to R. T. Hooe and co. to detain the vessel longer than twenty-four hours, lying off and on at the port of Falmouth, waiting for orders, and it is the only rational construction which can be given the contract to suppose that the fifth article refers to the first.
 

 
 *234
 
 A certain number of days are allowed for lading the vessel in Alexandria. But more days may be required, in which case demurrage is to be paid. So with respect to discharging and relading the vessel at the port of delivery in Europe ; and so with respect to the return cargo in Alexandria : in each case demurrage is stipulated in the event of a longer detention than is agreed on.
 

 When, then, a time is given to wait for orders at Falmouth, it is reasonable to suppose that the demurrage, which is to be paid, for a longer detention than the time given, relates to a detention occasioned by waiting for orders, or some breach of covenant by R. T. Hooe and co.
 

 The declaration does not state the vessel to have waited, lying off and on, for orders, but to have been taken into port, by the orders of Mr. Fox, when she was seized and detained by the officers of the British government.
 

 The covenant then was broken by taking the vessel into port, and it is to be enquired who is answerable for this, breach.
 

 It has been argued that R. T. Hooe and co. are answerable for it, because,
 

 1. Their orders for the further prosecution of the voyage ought to have been in readiness as stipulated.
 

 2. The vessel was taken into port by the orders of their agent, for whose acts they are accountable.
 

 3. The captain was, for the voyage,
 
 their
 
 captain ; and the stipulation to lay off and on, therefore, being broken by him, was broken by them.
 

 To the first argument, founded on the non-reception of orders, the observation already made may be repeated. The declaration does not attribute the detention to that cause, but to a compliance with the orders of Fox in taking the vessel into port.
 

 If, however, the charge in the declaration had been that orders were not ready on the arrival of the vessel,
 
 *235
 
 that charge would have been answered by the contract itself, which allows a delay of twenty-four hours for the reception of orders, without paying demurrage, and a longer time, if required, on paying therefor at the rate of £. 6. 6. 0. sterling, by the day.
 

 The failure then to have the orders, for the further destination of the vessel, in readiness on the arrival of the captain, or even within the twenty-four hours after his arrival, was no breach of contract on the part of R. T. Hooe and co. since it was an event contemplated and provided for by the parties ; and the question whether in the actual case which has happened, that is of a delay longer than twenty-four hours in giving the orders, but of a seizure before that time elapsed, R. T. Hooe and co. are responsible for demurrage accruing between the termination of the twenty-four hours and the receipt of the orders, cannot be made in this case, because there is no allegation in the declaration which puts that fact in issue.
 

 The court will proceed then to consider whether,
 

 2dly. R T. Hooe and co. are made accountable for the vessel’s being taken into port, since that measure was adopted in pursuance of the instructions of their agent, Mr. Fox.
 

 The finding of the jury goes far to prove that the defendants in the court below have made themselves responsible for the conduct of Fox. They find that R. T. Hooe informed the captain before he sailed from Alexandria, that on his arrival off Falmouth, he would receive orders from Mr. Fox, and that he must abide by such instructions. This finding creates some difficulty in the case. But this communication from Mr. Hooe to the captain ought to be taken, it is conceived, in connection with the provisional articles. Those articles explain the nature of the orders to be received, and by which the captain was directed to abide. In them it is expressly stipulated that on receiving these instructions, the captain should proceed directly for Havre de Grace, London, Hamburg, Bremen, or Rotterdam, as he should be directed. The orders then which he was to receive and obey, must be supposed compatible with this agreement,
 
 *236
 
 This construction is the more reasonable, because, annexed to the provisional articles, is an acknowledgment on the part of the captain, that he was to act conformably to them. He ought not to have understood declarations of the kind stated in the verdict, as directing a departure from a written agreement entered into by the owner and freighters of the vessel, and to which he had bound himself to conform.
 

 This article seems too to explain the power delegated by Hooe and co. to Fox; and to show that he was their agent for the purpose of directing the further destination of the vessel, but for no other purpose.
 

 If this be the correct mode of understanding this part of the verdict, and it is believed to be so, then the particular conduct of Hooe and co. did not authorize the captain to obey the orders of the American consul in taking the vessel into port; nor are they responsible for the consequences of that measure, unless they could be considered as responsible for a violation of the covenant by the act of the captain.
 

 If these facts are to be differently understood, and the communication made by Hooe to the captain is to be understood as authorizing him to obey any order given by Fox, though that order should be directly repugnant to the provisional articles, shall the liability of Hooe and co. in this suit, will depend on the question, whether the covenant to lay off and on at the port of Falmouth, was a covenant on the part of the owner, or of the freighters, of the vessel. This depends so much on the question whether Groverman or R. T. Hooe and co. were owners of the vessel for the voyage, that it will more properly be considered with that point.
 

 3. Was the captain under the direction of Groverman or Hooe and co. for the voyage ?
 

 This is to be determined by the whole charter party, ind the provisional articles taken together.
 

 It has been observed at the bar, and the observation has considerable weight, that Groverman lets the
 
 tonnage
 
 of
 
 *237
 
 the vessel, and not the whole vessel, to the freighters. The expression of the charter party, it will be perceived, varies in the part descriptive of the agreement, from what is used in the part constituting the written agreement. The indenture witnesses, “ that the said Groverman hath “ granted, and to freight letten, to the said R. T. Hooe “ and co.
 
 the brigantine
 
 Nancy, whereof he is owner,” &c. but immediately proceeds to say, “ and for and in “ consideration of the covenants herein after mentioned, “ doth grant and to freight let to the said R. T. Hooe “ and co. the
 
 whole tonnage of the aforesaid vessel, from the
 
 “ port of Alexandria, in Virginia, to the port of Havre “ de Grace, in France,” &c. As the latter are the operative words which really constitute the contract, it is conceived that they ought to prevail in construing that contract. Groverman, then, has only let to Hooe and co. the
 
 tonnage
 
 of the vessel, and therefore is the less to be considered as having relinquished ownership of her during the voyage. There are other circumstances which serve to show that the direction of the vessel, during the voyage, was intended to remain with Groverman. The cargo is to be delivered to Messrs. Andrews and co. of Havre de Grace, in good order, the danger of the seas only excepted. This is an undertaking on the part of Groverman, which he certainly would not have made if he had relinquished the direction of the voyage to Hooe and co. If the vessel,
 
 pro hac
 
 vice, had been their vessel, Groverman would not have contracted for the delivery of the cargo ; and for the delivery to a specified person.
 

 If the freighters had owned and commanded the vessel they might have delivered the cargo in Havre, to any other person, or have discharged at a port short of Havre, without injury to Groverman. So the cargo taken on board at Havre is to be such as Andrews and co. may think proper ; which return cargo is to be delivered to Hooe and co. in Alexandria. These stipulations all indicate that the voyage was to be performed under the orders of Groverman, because the acts stipulated are to be done by him, and the covenants are his covenants.
 

 This is further evidenced by the subsequent language of the charter party. The succeeding sentence begins with the words, “ And the said Groverman doth further
 
 *238
 
 " covenant to and with the said R. T. Hooe and co.” &c. showing that the preceding covenants were all on the part of Groverman. This
 
 further
 
 covenant is not only for the present condition of the vessel, but that she shall be kept well apparelled and well manned by the said Groverman
 
 during the voyage.
 
 The captain, then, was Groverman’s captain, the mariners were Groverman’s mariners; and this furnishes an additional reason for supposing the captain and mariners to be under his direction.
 

 After some further covenants on the part of Groverman the charter party proceeds thus, “ In consideration “ whereof the said R. T. Hooe and co. do covenant, &c. “ to and with the said W. Groverman, &c. that they “ will well and truly pay the freight stipulated therein.”
 

 Thus the whole language of the charter party goes to prove that the covenants respecting the voyage are on the part of Groverman, and on that account, as well as on the account of his letting only the
 
 tonnage
 
 of the vessel, and furnishing the captain and mariners, &c. he is to be considered as the owner of the vessel for the voyage, under the charter party. This opinion is strengthened rather than weakened by the provisional articles.
 

 The first article stipulates that particular instructions respecting the voyage shall be given to the captain, by Groverman, before its commencement. The words are, “ The captain or commander shall be instructed by his “ owner, previous to his sailing from the port of Alex- “ andria, to touch at Falmouth,” “ there to lay off and “ on twenty-four hours (or longer if desired) in day light,” &c. These orders, then, to the captain were to be given by Groverman, and it was by his authority that the captain was to act on that occasion. This explains the doubt as to the person who was to be considered as covenanting that the vessel should lay off and on, for twenty-four hours, at the port of Falmouth, and tends to show who was responsible for the breach of that covenant. This too is in addition to covenants in the charter party which are plainly Groverman’s, and is therefore the more to be considered as a covenant on his part. The act was to be performed by his authority, and the covenant was his covenant.
 

 
 *239
 
 On a consideration, then, of the whole contract between the parties, the court is of opinion that Groverman remained the owner of the vessel during the voyage, and is answerable for any misconduct of the captain.
 

 The covenant to lay off and on at the port of Falmouth, being the covenant of Groverman, the freighters are not answerable in this action, for the breach of it, should the orders of Fox be understood as their orders. It is probable that the course taken by the captain was the most prudent course ; but were it otherwise, the orders of Fox might excuse the owner from any action brought by the freighters for loss sustained by them in consequence of going into Falmouth, but could not entitle him in this action against the freighters.
 

 It is then the opinion of this court, that on this special verdict, the law is for the defendants.
 

 Judgment reversed, and the circuit court to enter judgment for the defendants.