WEBB (DURYEE v.). See Case No. 4,198.

## Case No. 17,320.

WEBB et al. v. PEIRCE.

[1 Curt. 104;[1] 15 Law Rep. 9.]

Circuit Court, D. Massachusetts. March, 1852.[2]

SHIPPING—CHARTER BY MASTER—OWNER PRO HAC VICE—LIABILITY FOR SUPPLIES.

Where a master hires a vessel "on shares." under an agreement to victual and man the ves-

---

[3] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

[2] [Reversing Case No. 17,321.]

sel, and employ her in such voyages as he thinks best, having thereby the entire possession, command, and navigation of the vessel, and the relation of principal and agent not existing between the master and owners, the master thereby becomes the owner, pro hac vice, during such time as the contract exists; and he, and not the general owner, is responsible for necessary supplies.

[Cited in Mayo v. Snow, Case No. 9,356; The Larch, Id. 8,085; The Freeman v. Buckingham, 18 How. (59 U. S.) 190; Thomas v. Osborn, 19 How. (60 U. S.) 30; The Caroline Casey, Case No. 2,421a; Donahoe v. Kettell, Id. 3,980. Explained in Flaherty v. Doane, Id. 4,849. Cited in Thorp v. Hammond, 12 Wall. (79 U. S.) 416; Fox v. Holt, Case No. 5,012; The Montauk, Id. 9,717; Mott v. Ruckman, Id. 9,881; The India, 16 Fed. 263; Scull v. Raymond, 18 Fed. 550; The International, 30 Fed. 377; The L. L. Lamb, 31 Fed. 33; Douse v. Sargent, 48 Fed. 695. Approved in The Alvira, 63 Fed. 154.]

[Cited in brief in Sims v. Howard, 40 Me. 277. Cited in Somes v. White, 65 Me. 546; Durando v. New York & N. Steam Boat Co., 4 N. Y. Supp. 387.]

This was an appeal from a decree of the district court of the United States for the district of Massachusetts, sitting in admiralty. [See Case No. 17,321.] The libellants sought to recover of the respondent, who was the general owner of the brig Antoinette, belonging to Belfast, in the state of Maine, the price of certain supplies furnished by them to the master of that brig, in the city of Boston.

CURTIS, Circuit Justice. It is proved in this case, and not denied, that the libellants furnished the supplies mentioned in the schedule annexed to the libel; that they were ordered by the master of the brig, and were suitable and necessary; and that, at the time when the supplies were furnished, the respondent was one of the general owners of the vessel. This is sufficient to make a prima facie case of liability; for, ordinarily, the master is the agent of the owner, clothed with authority to contract, in his behalf, for necessary supplies for the vessel, and, therefore, such contracts bind the owner personally, upon the familiar principles of the law of agency. But it is also true, that the master may not be the agent of the general owner for any purpose. A special property, carrying with it the entire possession and control, and leaving in the general owner only an interest in the nature of a reversion, may be created in a vessel as well as in any other chattel. And when such special property has been created, it necessarily follows, that the master is the agent of the owner of this special property in the vessel, and not the agent of the owner of the general or reversionary interest. The possession and control belonging to the former, and the employment being his, whatever is done by reason of that possession, and in the exercise of that control and employment, is his also, and the persons by whom it is done are his agents.

I am aware that a different doctrine is laid down by Lord Mansfield, in Rich v. Coe, Cowp.

636, and that Mr. Justice Story, in his treatise on Agency, (section 298,) has declared, in conformity with Lord Mansfield's opinion, that a private agreement between the owner and the master, by which the latter is to have the entire ship to his own use for a specified period, and is to make all the repairs at his own expense, cannot affect the liability of the owner to third persons, upon the well-settled principle of the law of agency, that the apparent authority of an agent may be trusted to by strangers. If the private agreement between the owner and master be of such a nature as to leave the relation of principal and agent still existing between them, it is undoubtedly true, that the owner would be bound by all contracts respecting the navigation and employment of the vessel, within the usual scope of the master's authority, notwithstanding a secret agreement between them, that the master should not thus bind the owner. But if the arrangement between the master and owner be such, that the relation of principal and agent does not exist, there is no room for the application of this principle of the law of agency, simply because there is no agency in the matter.

Now, that this relation of principal and agent, between the general owner and the master, may cease to exist, and that either the master or any third person may be clothed with a special ownership, so as to stand as a principal in respect to the navigation and employment of the vessel, is too well settled to admit of serious question. It is distinctly asserted by the supreme court of the United States, in Marcardier v. Insurance Co., 8 Cranch [12 U. S.] 39, and in Gracie v. Palmer, 8 Wheat. [21 U. S.] 605, and has been so held in numerous cases, in England and in this country, which are collected in 3 Kent, Comm. 138, 139, and the doctrine of Lord Mansfield must be considered to be overruled by the court of king's bench, in Reeve v. Davis, 1 Adol. & E. 312. In this case, there was an agreement between the owner and the master, by which the latter was to have the vessel to his own use for the period of twelve months, to victual and man the vessel, and keep her in repair. This agreement was unknown to the plaintiff, who furnished supplies for the vessel, and sought to recover their price of the general owner, who was held not to be liable therefor. Perry v. Osborne, 5 Pick. 422; Cutler v. Winsor, 6 Pick. 335; Winsor v. Cutts, 7 Greenl. 261; Sproat v. Donnell, 26 Me. 185; and Taggard v. Loring, 16 Mass. 337; are all cases of similar contracts between the master and owner, which were held to substitute the former in place of the latter, as owner, and that the relation of principal and agent did not exist between them. Concerning this last case, Mr. Justice Story, in Arthur v. The Cassius [Case No. 564], expresses some doubt; and he held that a master, who had agreed with the owner to employ and navigate, victual and man a vessel, retaining as his compensation, as master and for his own services, one half of

the freight which should be earned, could, by a charter-party, give a lien on the vessel to the shippers of merchandise. But he points out a difference between the contract of hiring in Taggard v. Loring, and in the case before him, and the question decided did not depend upon the rule of law now under consideration. It may well be, that the master, having for the time being the control and navigation of the vessel, may enter into charter-parties containing the usual clause, binding the ship to the merchandise and the merchandise to the ship, and that full effect would be allowed to such a clause by a court of admiralty, upon the ground that the power thus to bind the vessel to shippers, resulted from the master's possession, and the purposes for which he held it, wholly independent of the consideration, whether he was acting as agent or principal, or whether one person was entire owner, and the master his agent, or another person the owner, pro hac vice, and the master the agent of the latter. And I cannot suppose that this very eminent judge intended to cast the least doubt upon a rule of law so well settled, and which he himself had so often recognized, which enables the general owner to create a special ownership; which is thus interposed between him and all third persons as to whom the special owner is principal, and responsible as such. I understand the doubt expressed by him to have arisen in his mind, not concerning this rule of law, but as to quite a different question, viz., whether the contract in Taggard v. Loring was sufficient, in point of law, to create the master owner pro hac vice. Upon this question I think the rule is at this day perfectly well settled. When the possession, command, and navigation of the ship are let by the general owner, the hirer becomes owner pro hac vice; the possession is his; the employment is his; the contracts respecting that employment are his; the master, if he employs one, is his agent; if he commands the vessel himself, he acts on his own account. In the language of Chancellor Kent, (3 Kent, Comm. 138,) "this may be considered the sound and settled law on this subject." So that, in a case like this, where the question is, whether the general owner is liable for supplies furnished to the master, we must inquire whether the general owner had parted with the possession, command, and navigation of the vessel, and thus interposed another owner, to whom the credit must be deemed to have been given. This requires an investigation of the facts of the particular case; and it is correctly argued by the libellant's counsel, that the decisions relied on by the respondent's counsel —that when a vessel has been taken on shares, the general owner is not liable for supplies— do not necessarily apply to this case, because its facts may be different from those. Accordingly, much evidence has been introduced by both parties, relative to this contract of hiring, and its nature and incidents, a large part of which was not exhibited to the district court.

The testimony of the master, which is not controlled, proves that he made a verbal agreement with the owners to sail the vessel on shares. He was to victual and man the vessel, and pay one half the port charges, and he and the owners were to divide the gross earnings equally. He was to go wherever he chose with the vessel, and employ her in such ways as he might think fit during an indefinite period of time. On cross-examination, he says his contract was founded on—by which I understand him to mean, in conformity with—a well-settled usage at Belfast, to let small vessels on shares; that he had no right to appoint another master in his place, and that he has no doubt the owners could at any time remove him, and that he might give up the vessel without any notice; that there was no agreement to that effect, but he so understands the usage. I have examined the letters of the master which were put into the case, but I find in them nothing inconsistent with his testimony. Such being the contract, it is quite clear that, while it subsisted, the master had, in point of fact, the entire possession, command, and navigation of the vessel. It would be difficult to state a case of more absolute possession, command, and navigation. than that he should take the vessel, command her, victual and man her, go with her where he pleased, and employ her in such trade as he saw fit. But still, there are certain elements in the contract which require examination. The contract was for no definite period of time; and it is urged that, by reason of this, and by force of the usage of the trade, the owners might displace the master at any time, and so he had not the possession and command as owner, or any different possession and command from those of an ordinary master, sailing the vessel solely on the owners' account. That after a master has made such a contract as this, and has hired a crew, and purchased supplies for a particular voyage. and actually entered upon and partly completed it, the owners should have the right to turn him out of possession without notice, and thus break up an enterprise lawfully begun, and in the completion of which he has an important interest, and which is to be completed by his crew and his supplies, is so much in conflict with the nature of the contract, and the just rights of the parties flowing from it, that plenary evidence would be required to convince me of the existence of such a right. There is no reason to suppose that such a right was created in this case by any express stipulation. And the admission of the master that it existed, is rested by him solely on his understanding of the usage of trade applicable to such cases.

I do not deem it necessary to decide whether such a usage would be void on account of its unreasonableness. because I am not satisfied of its existence. The evidence is conflicting; and so much of it as tends to prove such a usage may be referred to the opinions of the owners of vessels who have testified to it, rather than to any settled practice, sufficiently general and long continued to create such a

right. Indeed, no one case of removal of the master during a voyage, by force of the usage, has been clearly proved; and many persons from Belfast and other ports, long acquainted with this trade, have been examined, who appear to be ignorant of such a practice. My conclusion is that, in point of fact, there is no such usage, and that it results, from the nature of this contract, when it is for an indefinite period, that it amounts to an absolute and indefeasible hiring of the vessel for every voyage which shall be begun before notice, by the general owner, of his intention to discontinue the contract. And this brings the case within that class of cases which have turned on such contracts of hiring, and in which it has been held the master was owner, pro hac vice, and not an agent of the general owner. Cutler v. Winsor, 6 Pick. 335; Perry v. Osborne, 5 Pick. 422; Thompson v. Hamilton, 12 Pick. 428; Manter v. Holmes, 10 Metc. [Mass.] 402; Thompson v. Snow, 4 Greenl. 264; Sproat v. Donnell, 26 Me. 185.

The evidence respecting the usage of trade is also conflicting as to the right of the owner to control the master in his choice of a voyage, and the power of the master to appoint another master in the home port.

I do not deem it necessary to find what the usage is upon the first of these points, because the uncontradicted evidence of the master proves an agreement with the owners that he should employ the vessel as he saw fit, and while this contract existed the owners had no power to control him in this particular. It does not seem to me to be shown that, by the usage, the master to whom the vessel is let, may appoint another in his place in the home port. There is a personal confidence reposed in him by the owners, who rely on his skill to manage the employment, as well as the navigation of the vessel, and the instances of such changes, spoken of by some of the witnesses, appear to have been infrequent, and were probably sanctioned by the owners as expedient and proper, rather than acquiesced in as matter of right on the part of the hirer. But, however this may have been, it does not seem to me inconsistent with the entire possession, command, and navigation of a vessel, that the hirer is restrained from appointing a person other than himself master, any more than it is inconsistent with the entire possession and temporary ownership of a house, that the lessee cannot underlet or assign his lease. It is a usual incident of ownership of a vessel, whether general or special, that the owner should have power to choose and appoint the master; but I know of no rule of law, and can see nothing in the nature of the case, which requires it to be an inseparable incident of such ownership: and, therefore, the fact that the hirer must himself, personally, command the vessel, does not prove that he is not owner pro hac vice. It has been suggested, on the authority of Dry v. Boswell, 1 Camp. 329, Skolfield v. Potter [Case No. 12,925], that the moiety of the gross freight the master retains, under such a contract, to his own use, may be considered to be in lieu of his wages as master, and so that it is only a contract of hiring of the master by the owners. But this is not consistent with the facts. The master not only commands the vessel, and manages her trade and employment, but victuals and mans her, and the moiety of the gross freight is not retained by him simply as a compensation for his services. It is more in accordance with the contract to consider the moiety of the gross freight paid to the owners, as their charter-money, for the use of the vessel. This is the view taken of the contract in the cases already referred to, and it is satisfactory to my mind. The truth undoubtedly is, as stated by Abbott, C. J., in 1 Ryan & M. 42, that, soon after the passage of the Registry Acts, the leaning of the English courts was to hold the registered owners liable for repairs and supplies. Rich v. Coe was one of those decisions. But the subject having become more accurately understood, a better principle was introduced, and more recent cases decide that the true question is, to whom was the credit given. If no intervening ownership has been created, the credit is deemed to be given to the general owner. But if the vessel is let out to hire, the owner is no longer a contracting party for supplies, and so not liable. Such is the modern doctrine on this subject: it is now too well settled to be departed from; and I may add, that it seems to me to rest on sound principles. My opinion is, that, when a master hires a vessel "on shares," under an agreement to victual and man the vessel, and employ her in such voyages as he thinks best, he thereby becomes the owner, pro hac vice, during such time as the contract exists, and that he, and not the general owner, is responsible for necessary supplies. There is a circumstance in this case, not necessary, in my judgment, to its decision, but which tends strongly to strengthen the equity of the defence. It is that Webb, one of the libellants, who sold these supplies to the master, was for several years a resident of Belfast, and engaged in such business at that place that he must have been acquainted with the custom, nearly universal there, to let vessels, of the class of this brig, to the masters, on shares, and that he therefore had ample means of knowing that this vessel was so let, and that the master, and not the owners, was to victual and man the brig.

To prevent misapprehension, I desire to state, that I have examined the able opinion of Judge Ware, in Skolfield v. Potter [supra], in which he charged the general owners of a vessel let on shares, with the wages of a seaman. There are elements in that case upon which the decision may rest consistently with the principles upon which this case has been decided; and I do not intend to express any opinion as to a claim for wages on a general owner, who has received freight earned in the voyage, for which wages are claimed. The result is, that the decree of the district court is to be reversed, and the libel dismissed, with costs.