HOPKINS<br>v.<br>PRATT.

---

## SLARK, DAY AND STAUFFER et. al. *v.* BROOM AND CAUGHLIN.

In ordinary cases, a captain signing a bill of lading, is considered as signing as the agent of the owners of the vessel, and being an act done within the scope of his authority as master, his contract is binding upon the owners. The contract, under the bill of lading, is, to transport the goods safely to the place of destination, and there deliver them to the consignees or their order. This duty must be performed, unless its performance be prevented by the happening of the excepted perils. If under the pressure of extreme necessity, a sale of the cargo becomes necessary, still the proceeds of sale, after deducting the contributive share for general average and other lawful charges, must be accounted for, to the owners of the goods, by the captain and owners of the vessel.

A bill of lading, by legal implication, announces the liability of the owner of the ship, and this liability cannot be excluded by an extrinsic fact, not communicated to the shipper. Where, therefore, the shipper received bills of lading in the usual form, in the absence of evidence to the contrary, he may justly be considered as looking to the usual responsibility, to wit, that of the captain, the ship and the ship-owner.

By the Court : " We think it clearly results, that it (the charter party) was a contract to carry, for a stipulated reward, all such goods up to the extent of the ship's capacity, as the charterer should furnish, and such passengers, up to a certain number, as he should furnish; but that the possession, command and navigation of the ship, remained in the owners, through the master and mariners appointed and paid by them; and that the responsibility for the safe delivery of the cargo, saving such losses as might arise from excepted perils, rested upon the master and the owners."

Where, therefore, the vessel was stranded, and the master sold the cargo, and appropriated a part of the proceeds for the maintenance of the passengers, and for their transportation, under what he regarded the authority of the passsengers act of 12 and 13 Victoria, it was held, that the ship-owner was liable to the freighter.

Although the freighter may have a privilege on the vessel for a non-delivery of the cargo, he has no privilege on the insurance money due under a policy covering the vessel.

Where the privilege claimed is one resulting from the nature of the obligation, it pertains to the merits, and may be tried with them.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge,* J. *Hite* and *Gaither,* for plaintiffs.

*Benjamin* and *Micou,* for defendant. On the whole case, we conclude that the contract of affreightment of the plaintiffs, was made only with the charterers. To them they entrusted their goods, and of them only, they have the right to demand them. Between the plaintiffs and the owners, there is no contract and no privity, and consequently no action has accrued. *Agricultural Bank* v. *Barque Jane,* 19 L. R. 8.

In this case the ship was lost, and the plaintiffs claimed a privilege upon her insurance money, and sequestered it in the hands of the insurers. Even if it were true, that the plaintiffs had by their shipment acquired a lien on the ship, that lien does not extend to the insurance money. It has been so expressly decided in *Thayer* v. *Goodale*, 4 L. R. 222.

By the court:

SLIDELL, J. The object of this suit, is to recover of the defendants, as owners of the ship Cato, the value of certain goods shipped on board that vessel at Liverpool, under bills of lading, in the usual form, signed by her captain, and which were not delivered at New Orleans, the port of destination.

The Cato, an American ship, belonging to the defendants, was chartered at Liverpool, by the captain, to *James Browne & Co.*, by a charter party, in these words:

"Memorandum for charter, Liverpool, 25th January, 1851: It is this day mutually agreed, between *Captain Robinson*, of the good ship or vessel called the Cato, of the burthen of 655 tons, or thereabouts, now at Liverpool, whereof        is master, and *Messrs. James Browne & Co.*, of Liverpool, merchants and freighters of the other part, that the said ship, being tight, staunch and strong, and approved of by the surveyors appointed by the government, as being eligible to carry passengers, shall, with all convenient speed, be made ready, and receive and take on board a cargo of lawful merchandise, and such steerage passengers, as the charterers may procure, not exceeding the legal complement, 275; charterers to find provisions according to law, berths, water-casks, water, fuel and cooking grates, and pay the hospital and commutation money, at the port of delivery; the vessel not to be loaded deeper than seventeen and a half feet aft and seventeen feet forward, and to be dispatched at the expiration of fifteen days after she obtains a proper loading berth, and is ready to commence loading in Waterloo or Victoria Dock, or sooner, at the charterers option. In all, not exceeding what she can reasonably stow and carry, over and above her cabin, tackle, apparel, provisions and furniture; and being so loaded, shall therewith proceed to New Orleans, or so near thereunto as she may safely get, and deliver the same agreeably to bills of lading; and so end the voyage. (Restraints of princes and rulers, the dangers of the seas and navigation, fire, pirates and enemies, during the said voyage, always excepted.) The ship to be provided by the owners, with proper boats, ventilators, two life-buoys, houses over the hatchways and camboose, and a passenger's cook.

"And the said charterers do hereby promise and agree, to load the said vessel, with said cargo, at Liverpool, and to pay freight as follows: For the hire of the vessel, as above mentioned, the sum of eight hundred pounds. The freight and primage, as per bills of lading, to the extent of this amount, to be taken in payment at the port of delivery, at four dollars and eighty cents per pound; the deficiency, if any, to be paid in Liverpool, before sailing, in cash, deducting insurance on passage money. Demurrage, if detained by the charterers beyond the above time, to be paid at the rate of seven pounds, British sterling, per day; but the vessel not to be required to remain on demurrage longer than ten days; but if head winds prevail at the expiration of said laying days, preventing vessels of similar size and draft from sailing, then the vessel to continue taking cargo and passengers, to the extent herein named, without the charterers being liable to demurrage.

"The vessel is to be consigned to charterer's agents at New Orleans, allowing them two and a half per cent commission. Penalty for the non-performance of this agreement, £800. (Signed) J. W. ROBINSON and JAMES BROWNE & Co."

The vessel received her cargo and passengers under this charter party, and proceeded on her voyage; but having met with a disaster at sea, by striking and being stranded, entered the port of Nassau in distress; and there, after survey, being pronounced incapable of proceeding, was abandoned, and the passengers and cargo landed.   The cargo was then sold at Nassau, for the benefit of whom it might concern; and by the adjustment of the average made by an adjuster, under the direction of the defendants, it appears, that after the proper contribution for paying salvage, expenses, &c., there remained the sum of $7780, which was received by the captain.   Of this sum, about $1000 was paid, by the captain, into the hands of the defendants at New Orleans; the balance of the sum, was expended by the captain for the maintenance of the steerage passengers at Nassau, and in conveying them, by other vessels, thence to New Orleans.

There is, in evidence, an act of parliament, 12 and 13 Victoria, entitled an act for regulating the carriage of passengers in merchant vessels.   The 24th section enacts as follows : And be it enacted, that in case any " passenger ship" shall be wrecked or otherwise destroyed, or shall by any other cause whatever, be prevented from landing her passengers at the place they may have respectively contracted to land; or in case such ship shall put into any port or place in a damaged state, or shall not, within a reasonable time, according to the circumstances of each case, but not exceeding six weeks in any case, be ready to proceed with her passengers on her intended voyage, after having been first efficiently repaired, and in all respects, put into a sound and seaworthy condition; then, in any of such cases, such passengers respectively, shall be provided with a passage, by some other equally eligible vessel, to the port or place at which they respectively may have originally contracted to land; and in default thereof, such passengers respectively, or any emigration officer on their behalf, shall be entitled to recover, by summary process, as hereinafter mentioned, all monies which shall have been paid by or on account of such passengers, or any of them, for such passage, from the party to whom the same may have been paid, or from the owner, charterer, or master of such ship; and also, such further sum, not exceeding five pounds, in respect of each such passage, as shall in the opinion of the justices of the peace, who shall adjudicate on the complaint, be a reasonable compensation for any loss or inconvenience occasioned to any such passenger, or his or her family, by reason of the loss of such passage : provided, always, that no policy of assurance effected in respect of such passages, or of such passage and compensation monies, by any person hereby made liable in the events aforesaid, to provide such passages, or to pay such monies, shall be deemed to be invalid by reason of the nature of the risk, or interest sought to be covered by such policy of assurance.

There is also the testimony of two captains, who state, that they have made many voyages between New Orleans and Liverpool; and that they have made similar charter parties.   They testified that, on such contracts, they retained possession, control, management, and navigation of the ship; that the expenses of the navigation were incurred by the owner, such as wages of captain, crew, port-charges, and victualling of the ship; that, in such contracts, the universal custom of Liverpool, as understood by the witnesses, among ship-owners, masters, and merchants, was, that the master of the ship should retain exclusive possession, control, and navigation of the ship, for the owners' account and benefit; and that the owners incur the expenses of navigation, and that the

SLARK
*v.*
BROOM.

SLARK
v.
BROOM.

charterer has nothing to do with the navigation and control of the vessel after she proceeds to sea; that the manner in which the stipulated price of the ship is paid, is by taking the amounts of freight to the extent of the freight bills. If there be a deficiency, the charterers pay the deficiency; and, if there is a surplus, the charterers take that surplus, and that ends their relations with the charter. Under a contract of that kind, the captain and owners become responsible for the transportation of the goods. On cross-examination, by defendants, these witnesses testified that, under a charter party like this, the charterer makes the engagements for the freight; that they never had a case under a charter party like this, in which the question arose, whether such a loss would fall on the charterer or the owners.

The question presented for our decision, under the state of facts above presented is, whether the owners of the ship are liable to the shippers in a personal action for the money so received and expended by the captain. The district court gave judgment for the plaintiffs, and the defendants have appealed.

It is contended, for the defendants, that the act of Parliament imposed upon the captain the duty of selling the cargo, in order to accomplish the transportation of the passengers. But, we find no such duty imposed by the statute in the section above cited; nor does it seem to us to be reasonably inferrible from other portions of the law. If there was any power in the master to sell, it rested upon the general law.

We must look, then, to the charter party, the bills of lading, and the attendant circumstances, in order to arrive at a solution of the question.

If we look simply to the bills of lading, there can be no doubt that the defendants are liable. As we have stated, they are in the usual form, and signed by the captain. In ordinary cases, a captain so signing, is considered as signing as the agent of the owners of the vessel; and being an act done within the scope of his authority as master, his contract is binding upon the owners. The contract is, to transport the goods safely to the place of destination, and there deliver them to the consignees or their order. This duty must be performed, unless its performance be prevented by the happening of the excepted perils. And if, under the pressure of extreme necessity, a sale of the cargo becomes necessary, (and the present cause, under the meagre evidence before us, can be considered as exhibiting a case of such necessity,) still, the proceeds of sale, after deducting the contributory share for general average, and other lawful charges, must be accounted for to the owners of the goods, by the captain and owners of the vessel.

But, are the rights of the plaintiffs against the owners, under the bill of lading, affected by the fact of the charter party?

In the first place, it must be observed that no knowledge of the existence of the charter party is brought home to the shippers. If we infer that *Browne & Co.* personally sought out the shippers, and made the engagements for freight with them, *non constat,* that the shippers were informed whether they were acting as charterers or as consignees of the vessel. The shippers received bills of lading in the usual form, and in the absence of evidence to the contrary, may justly be considered as looking to the usual responsibility, to wit, that of the captain, the ship and the ship-owners. It seems unjust to deprive a party of the usual guarantees which attach to such a contract as he is making, unless there be something to warn him that other guarantees are to be substituted for them. The matter here, so far as the knowledge of the shipper is concerned, rests upon the bill of lading, which, by legal implication, announces the liability of the

owner of the ship; and yet the shipper is told that this liability is excluded, by an extrinsic fact not communicated to him.

Independently, however, of the absence of notice, what was the character of the charter party, and its legal consequences under the fair scope of the decided cases? For, in a matter of this grave commercial importance, authority is of great moment. If the present charter party is really controlled by a well settled current of authorities, both shipper and owner may well be considered as acting upon them, and are not to lose relief or escape liability by a recurrence to abstract principles, ingeniously deduced from the general law of contracts.

In *McIntyre* v. *Brown*, 1 Johns. 229, the court said: the true distinction was, that, where, by the terms of the charter, the ship-owner appoints the master and mariners, and retains the management and control of the vessel, the charter is rather to be considered as a covenant to carry goods; but, where the whole management is given over to the freighter, it is more properly a hiring the vessel for the voyage; and, in such case, the hirers would be deemed owners, *pro hoc vice.*

We believe this opinion of a very learned court, which was given many years ago, has ever since received a substantial concurrence in the United States. In *Marcadier* v. *Chesapeake Insurance Company*, 8 Cranch, 49, we find the Supreme Court of the United States following the same rule : "A person," says Mr. Justice Story, in that case, "may be owner for the voyage, who, by a contract with the general owner, hires the ship for the voyage, and has the exclusive command and navigation. Such is understood to have been the case of *Vallejo* v. *Wheeler*, Cowper, 143. But, when the general owner retains the possession, command, and navigation of the ship, and contracts to carry a cargo or freight for the voyage, the charter party is considered as a mere affreightment sounding in covenant, and the freighter is not clothed with the character or legal responsibility of ownership. Such was the case of *Hooe & Co.* v. *Groverman*, in this court, 1 Cranch, 214. In the first case, the general freighter is responsible for the conduct of the masters and mariners during the voyage; in the latter case, the responsibility rests on the general owner. On examining the charter party in the present case, there can be no doubt, from the terms and stipulations, that it falls within the latter class of cases. The master, who was the general owner, retained the exclusive possession, command, and management of the vessel, and she was navigated at his expense during the voyage."

At a later day, that eminent commercial lawyer, Mr. Justice Washington, observed, in *Palmer* v. *Gracie*, 4 Washington, 122: "The general rule is, that where the owner employs, pays, and supports the master and crew, retains the control and navigation of the vessel, by means of the former, and is answerable for his conduct, a special ownership and possession do not pass to the charterer, although the ship is let and hired, and although the freight reserved be a gross sum." We refer to this case, as containing a learned and elaborate review of the decided cases in England and the United States.

Now, in applying these principles to the contract in question, which we are to interpret, not upon any single, isolated clause, but upon its entire language and provisions, we think it clearly results, that it was a contract to carry, for a stipulated reward, all such goods, up to the extent of the ship's capacity, as the charterer should furnish, and such passengers, up to a certain number, as he should furnish; but, that the possession, command, and navigation of the ship remained in the owners, through the masters and mariners appointed and paid by them; and that the responsibility for the safe delivery of the cargo, saving

such losses as might arise from the excepted perils, rested upon the master and the owners.

It must be acknowledged, that there are some of the English cases which seem to militate against the conclusion to which we have come in this case. There is an apparent want of harmony in the decisions of the English courts, which, perhaps, is really attributable to the imperfect manner in which some of the cases are reported, leaving us in the dark as to the terms of the particular charter party. But, although the question in English jurisprudence seems to rest upon grounds somewhat uncertain and varying, we are inclined, on the whole, to believe, that this case would be decided there in favor of the plaintiffs.

In their petition, the plaintiffs allege that they had a privilege for their claim upon the ship Cato, and that the vessel having been lost, they have a privilege upon the amount of insurance effected upon her ; they obtained a writ of sequestration, which was levied upon a sum of $5000 in the hands of the Crescent Insurance Company. The district judge, in giving judgment in favor of the plaintiffs against the defendants personally, gave also a judgment of privilege upon the property sequestered. It would seem that the district judge supposed the vessel had been sequestered, for, in his written opinion containing the reasons for judgment, he speaks of the right of the plaintiffs to a judgment, "with privilege on the ship."

Although the plaintiffs might have had, for the non-delivery of the goods, a privilege upon the ship, had she arrived within our jurisdiction, we know of no provision of our laws which gives them a privilege upon the insurance money. That no such privilege can be claimed, was decided in an analogous case, *Thayer* v. *Goodale*, 4 L. R. 222; and in *Eymar* v. *Lawrence et al.*, 8 L. R. 42, it was held, that the privilege of the master for his wages does not extend to the insurance money, received by the owner's agent from the underwriters, upon the vessel which was destroyed by perils of the sea.

But it is said, that the defendants have lost the right of inquiring into that matter, because they did not take a rule to set aside the sequestration before an answer was filed, and the cause put at issue on its merits. A similar position was unsuccessfully assumed in the case last cited. It may be, that the defendants lost the right of questioning the regularity of the sequestration in point of form, by pleading to the merits without objection.

But the privilege claimed was a privilege resulting from the nature of the obligation ; not, as in cases of attachment, a privilege resulting from the judicial proceedings. The question of the existence of a privilege seems, therefore, one pertaining to the merits, and to be determined with them. See also the remarks of the court, in *Eymar* v. *Lawrence*, upon art. 724, C. P.

The case of *Watson* v. *McAlister*, 7 M. R. 369, was a case of attachment. See also *Myers* v. *Perry*, 1 Ann. 373.

It is, therefore, decreed, that so much only of the decree of the district court, as adjudges a privilege on the property sequestered, be reversed, and said claim of privilege is hereby rejected. And it is further decreed, that said judgment, in other respects, be affirmed, the costs of the appeal to be paid by the plaintiff.