## THE L. L. LAMB.

(*District Court, E. D. Michigan.* June 1, 1887.)

1. SEAMEN'S WAGES—LIEN ON SHIP—CONTRACT WITH CHARTERER—WAIVER.
   Where the vessel was chartered for a wrecking expedition, to be accompanied by the owner and master, but the crew to be paid by the charterers; *held*, that the lien on the ship was not waived by the seamen because they knew of the contract with the charterers and hired to them. It requires some express agreement by the seamen to serve on the personal credit of the charterer, or else a state of facts from which that intention must necessarily be implied.

2. SAME—CONCEALMENT OF FACTS BY MASTER OR OWNER.
   If the master and owner know that the charterers are insolvent and do not disclose that fact to the seamen at the time of engaging them for the charterers, the concealment is a fraud upon them, and any agreement to release the lien on the ship would be disregarded by the court.

In Admiralty.
*Chas. K. Dodge* and *Edward McNamara*, for libelant.
*Howard Wiest*, for claimant.

HAMMOND, J. John Buzzard was owner and master of the schooner L. L. Lamb, and the libelants were for several months prior to the disputed transactions involved in this suit the crew of that vessel. He chartered her to McMorran & Reynolds at $15 a day from the eighth day of June, 1886, for a wrecking expedition to Lake Superior; they "to furnish provision and men, (except the master and mate,) all wrecking gear, pay all tow-bills and wages, except master's and mate's, repair all damage they may do except natural wear, and tear and excepting her being wrecked or disabled." The schooner went to the lake to work upon a sunken steamer accompanied by a tug, Buzzard going as master and his son as mate. There were some 20 or 25 men employed by the charterers to go upon this expedition, some of them being seamen and others not. She was gone about three months, and was employed in taking out railroad iron, or lying by to receive it from a lighter, sometimes sailing out to the wreck and sometimes remaining in the port near by, during which not much was done in the line of a seaman's duty except to take care of the vessel, wet her down, keep her sails in condition, scrape masts, etc. On the return of the schooner the three libelants arrested her upon this libel for wages at $1.25 per day for each of them. According to Buzzard's contention and proof he paid off these three men, who had been his crew for some months, on the day of the charter-party, and they then hired to the "wrecking party," as the other men did, and were to look to that concern for their wages and not to him. According to the contention and proof of the libelants they were hired as seamen and were continued as the crew of the schooner by Buzzard himself, but were also to help the wreckers in their work, which they did. It seems from the proof that the "wrecking expedition" was a venture of two insolvent persons named Merriman and Fowler, who were without credit,

so that Buzzard would not trust them for the price agreed upon; and they had McMorran & Reynolds (whom Buzzard was willing to take "as security") become the charterers in the writing, and therefore under the contract responsible to Buzzard; but Merriman & Fowler were the real charterers and managed the expedition. As might have been expected, these insolvents did not pay any of the men, at least that is the inference, since every one who testifies in the case says he has not received any money, and the libelants insist on the security of a lien upon the schooner for their wages. To this they are entitled, even upon Buzzard's own testimony, for it is not at all pretended that these libelants especially agreed to release their lien upon the vessel or to look solely to the charterers for their wages, but only that such is the legal effect of the contract as implied from the circumstances. But that is a mistake. The maritime or admiralty law does not permit any such *implication* from the proven circumstances, as against seamen for their wages, whatever it may do as to supplies or repairs or the like, as to which no opinion need be now expressed. To seamen the law secures a lien on the ship unless they especially contract otherwise. The proof therefore must show not only that they knew of the charter-party and of the stipulation that the charterers were to be responsible for the seamen's wages, but also that they *agreed* that they would accept service alone upon the personal credit of the charterer, and not look to the ship for a lien. If they do not so agree the lien remains whether the regular owner relinquishes his control to the charterer or remains wholly or partially in possession, either on his own account or as the agent of the charterer, and whether the charterer be the owner for the voyage or charter term or only a contractor for the ship's services, and be the terms of the charter-party what they may. That is to say, a personal liability of the owner for the wages, *qua* owner, or as master, one or both, is not at all essential to the lien on the vessel, but *that* may and does arise just as well out of the personal liability of the charterer, for the seamen's wages, whether he be the owner *pro hac*, or only a mere contractor in the enterprise; and the lien is not released or surrendered by the seamen unless they consent to look solely to the personal liability of the charterer. Or, to put it in another way, the lien on the vessel for seamen's wages always exists, unless they waive or release it knowingly and intentionally, and there is not any intimation in the proof that these men did that.

Another matter may be mentioned here. A court of admiralty will not tolerate such sharp practice against seamen as that which this master and owner confesses he attempted against these men, who had been his faithful crew, and whom he wished to stay by him in this expedition, as he concedes in his testimony. His pretense is that they agreed to hire to Merriman & Fowler and not to him, although *he* made the contract for them, but at their request, he says. They never spoke to Fowler or Merriman, but it is pretended that they heard the contract that he made in their behalf, being near enough to hear, "unless they were very deaf," the witness says. But it turns out that Merriman & Fowler were so utterly worthless as paymasters that the master and owner would not

deal with them himself and would not even charter to them, but must needs have *security* for himself by making the contract in terms with McMorran & Reynolds. Now, he does not seek to have these contractors, McMorran & Reynolds, who are responsible to him, stand responsible also to these seamen for their wages as the charterers in law, but seeks to throw them upon the charterers in fact, the insolvent adventurers Merriman & Fowler, whom he rejected. That is his theory; and when his attention is called to it in cross-examination, he brazenly says "that was not my bread and butter." But being the real master and owner actively in possession and continued control and in fact making the contract with the seamen, he cannot escape the lien of the wages on the ship by any such bad faith towards his crew as that; at least, not upon any *implications* based on their knowledge of the bare fact that he was under charter and that his charterers, real or imaginary, were to pay the seamen's wages. A release by them, under such circumstances, would be set aside for the fraud of the master and owner—their agent in the transaction—in concealing from them that full knowledge of all the facts by means of which he was enabled to protect himself. This would be done in behalf of men more intelligent than seamen usually are, and, in their behalf, more readily by a court of admiralty than elsewhere.

In this view it is hardly worth while to consider the circumstances upon which the implication is sought to be based that these men contracted with Merriman & Fowler, and therefore can have no lien on the ship. But they are alike delusive and fall short of any fair implication to that effect. Buzzard no doubt had that intention and tried all the way through to so conduct the business as to protect his vessel against the lien, while at the same time he had all the benefit of their services as seamen. But he fell short of this unworthy design by not having it fairly agreed upon at the start that the men were to rely alone on Merriman & Fowler, upon whom he was unwilling to rely, for their wages, and letting them know and agree that they would not look to the ship but to these insolvent adventurers, knowing them to be such, as fully as Buzzard knew that fact. He could not have gotten the men on those terms and he knew it, wherefore he relied on his mistaken notion that they would have no lien if they should make the contract with Merriman & Fowler, which he undertook, as their agent, to make for them. On the other hand, they did not understand it that way. They knew, no doubt, of the charter-party; that Merriman & Fowler as the charterers were to pay wages; that Buzzard did not expect to pay wages; that while he wanted them as a crew for his vessel, and they wanted to go with him, that there was besides other work to do, and that the charterers were to do the hiring; that the expedition was of a character that would demand that they should not only do seamen's work but such other as they were required to do about wrecking the sunken steamer and loading her cargo in the schooner, and that other men were to be employed far in excess of any requirement of navigating the schooner. They knew all this and agreed to it; and yet they never separated from that vessel or ceased to act as her seamen. Others helped them as

they helped others, and this created confusion and "growling" about a division of the work. But, after all, these three libelants were the crew, and did generally the work of the crew, and were treated as such all the way through. To such an extent did this go that when Buzzard's son, who acted as mate, became sick, Dove, one of the libel-ants, discharged that duty, and it is a miserable pretext for Buzzard to now say that Dove did this "as a personal favor to himself." The truth is, they regarded themselves, as Buzzard did, as the schooner's especial crew, and he relied on them in that capacity, and while he did assume that Merriman was the responsible manager and the one to pay all the expenses, and ostentatiously kept that notion afloat, there was never the slightest circumstance to indicate that these three men did not occupy, as they claim to do, the especial relation ·of seamen attached to the schooner, and not belonging like the rest to the wrecking force, although they were also to help in that work. Nor is there any reason growing out of the terms of the contract to separate or apportion their work. The managers did not do this, and there is in the proof no basis for the apportionment. They should have the lien for their contract wages, and Buzzard should look to his charterers or to Merriman & Fowler for reimbursement for the wages so paid by the ship.

There is abundant authority for this judgment. Under the doctrine of *Leary* v. *U. S.*, 14 Wall. 607, and the cases like that, it might well be held that Buzzard remained the owner, and entirely responsible as such. He retained full possession and control over the navigation of the vessel, accompanied her as master, and 'was, so far as these men could see or know, as much her owner and master as he had been before, during their service with him. The charter-party only gave Merriman "charge of said schooner in all cases, pertaining to the wrecking of the steamer Algomar." This was only a very limited and qualified control, and it may amount to no more than a contract for the vessel's service under her own master and mate and a crew to be paid by the contractor. That state of things could not affect the seamen's lien for wages. Perhaps Buzzard would have been liable personally for any tortious collision under *Thorp* v. *Hammond*, 12 Wall. 408. If so, he would be likewise liable for wages personally. *Hooe* v. *Groverman*, 1 Cranch, 214; *Marcardier* v. *Chesapeake Ins. Co.*, 8 Cranch, 39.

But, beyond this relation of ownership, and no matter who was the owner, either general or special, under this charter-party, the lien for seamen's wages attached under the presumption of the maritime law, was never displaced, and could not be without the seamen's express consent. As Mr. District Judge BENEDICT says:

"It was necessary for the claimant to go further and show that the libel-ants agreed to waive a lien upon the vessel and rely upon a personal credit alone." *The Sirocco*, 7 Fed. Rep. 599.

The learned judge states the principle most clearly in the following extract:

"The presumption of the maritime law is that services performed by a seaman on board a vessel are rendered upon the credit of the vessel, as well as

that of the master and owners, and by that law seamen acquire a lien for their wages in all cases, unless it be made to appear that a waiver of the lien and an exclusive personal credit formed part of the contract of hiring." Id.

Here, as before stated, there is no pretense of this waiver, except by implication from a knowledge of the charter-party and of a hiring by the charterer. But a hiring by the owner does not constitute a waiver, whether he be general owner or owner *pro hac*, and why should that by a charterer have any other effect? It takes something more to constitute a waiver of the lien, and always that must be the purpose in view, for no one ever waives or abandons a lien unless he does it with the intention of doing that thing. The law sometimes implies the intention, no doubt, but never from a circumstance that does not within itself necessarily indicate that intention. Hence, the waiver of a seaman's lien for wages cannot be necessarily implied from the bare fact of hiring to a charterer any more than from the bare fact of hiring to the master or owner. Certainly, not from the fact of hiring to an insolvent charterer whom the master and owner would not trust without security.

Again, says another learned judge:

"Supposing the libelants to be seamen, employed in the maritime service, they have a lien on the vessel, whether she be sailed on shares or not. Their knowing that she was so sailed can make no difference. Whoever is that owner, the seamen have the vessel as security, and they are not bound to heed arrangements made with third persons." *The Canton*, 1 Spr. 437.

The great case of *Skolfield* v. *Potter*, 2 Ware, (Daveis,) 394, is conclusive of this point, and also that it is a fraud upon the men not to inform them specifically that they are to look alone to a third party; and, I may add, if the owner or master knows that the third party is irresponsible, it is equally a fraud not to inform them of that fact, as well.

Nor is it understood that the cases like *Webb* v. *Peirce*, 1 Curt. 104, which recognize this superior *status* of the lien of a seaman for wages, have at all affected this principle, because they hold that it does not extend to protect furnishers of supplies and other maritime lienholders. This lien of the seaman for wages exists, too, quite beside any personal liability of the general owner; for, while he may not be liable in *that* capacity, the vessel is, nevertheless, upon peculiar principles, liable *in rem* to the seamen for their wages, whatever may be said of other liens in that regard. *Flaherty* v. *Doane*, 1 Low. 150. Of course somebody must be personally indebted for the wages, or there could be no lien on the ship; but it is, as regards the lien, quite immaterial whether it be the master or the general or special owner, who is indebted under the contract; for the seamen may always look to the ship itself, unless they willingly and knowingly waive that security by consenting to accept the personal liability of some one, and agree to contract *solely* upon that credit. But this must be a matter of agreement explicitly expressed, or it may be necessarily implied, perhaps; yet, never a mere inference from facts insufficient within themselves to demonstrate that such was their intention and agreement. This is the rule to be extracted from the authorities, as I understand them. In *The Highlander*,

1 Spr. 510, it is also ruled that such a contract as that relied on in this case will be carefully scrutinized by the court, and not be allowed to operate to displace the lien, even where shipping articles were signed indicating it, without the clearest proof that the seamen so understood it. It is a case directly in point as a precedent for this, and was also, like this, a contract to go upon a wrecking expedition. The same learned judge, in the case of *The Adelphi*, MS., A. D. 1862, cited in *Flaherty* v. *Doane*, *supra*, and elsewhere, also held that the lien was not waived by hiring to a charterer. In *The Erie*, 3 Ware, 225, 230, it is said that "no one is ever presumed to waive his own rights. Express words are required for that purpose." Also, that the owner has no right to bargain away the privilege of the seamen by his contract with the charterer, unless they were parties to the contract, and Emerigon is cited as authority for it, as well as others. In *The Artisan*, 9 Ben. 106, which was chartered by a circus company, it is held that the lien exists without regard to the personal liability of the owner, and that incidental work on shore for a circus company does not deprive the seamen of their lien.

In *The Montauk*, 10 Ben. 455, the fact that the seamen had knowledge of the master's agreement to sail on shares does not raise any presumption that his own agreement was such as to destroy the lien; and there the learned judge explains such cases as *The Bambard*, 8 Ben. 493, and *Scott* v. *Failes*, 5 Ben. 82, to have proceeded upon the same understanding of the law, although decided against the libelants. He also doubts whether any different understanding prevails in the Southern district of New York, and says the weight of the authority is in favor of this ruling. *The Galloway C. Morris*, 2 Abb. 164, is to the same general effect; and so are *The Samuel Ober*, 15 Fed. Rep. 621, and *The Clayton*, 5 Biss. 162, where the charterer who hired the crew became insolvent and had made an assignment. Attention may be called to Rev. St. U. S. § 4535, which forbids that seamen shall be held to have forfeited their lien, or to have abandoned any remedy for wages, except by an agreement in accordance with the merchant seamen's act, to show that it is also a statutory policy to preserve the lien against any such implications as are relied on here, and that that policy is in harmony with the general law, whether that act applies to the lake navigation or a case like this or not.

I wish to say, in closing, that this case was partially tried before Mr. District Judge SEVERENS, during his designation, but not being finished was left over by him for completion before the court next sitting, but that he examined the authorities and reached the same conclusion that is here announced, and to his notes and suggestions I am much indebted in the preparation of this opinion.

Let the libelants have a decree for the amount claimed by each, as shown by his testimony, which I understand to be for 91½ days at $1.25 per day for each of them, less the credits admitted by each in his testimony. The clerk will calculate the amount from the testimony without the costs of a reference, which is unnecessary, since there is no dispute about the time or amount. Let claimants also pay costs. So ordered.