(Hamilton County Court of Common Pleas).

THE THOMAS GIBSON COMPANY v. JOHN CARLISLE ET AL. ; JAMES GRIFFITHS & SONS v. JOHN CARLISLE ET AL. ; LAWRENCE GRACE v. JOHN CARLISLE ET AL. ; THE LAIDLAW & DUN COMPANY V. JOHN CARLISLE ET AL. ; THE JAMES L. HAVEN COMPANY v. JOHN CAR-LISLE ET AL. ; JOHN B. SCHRODER ET AL. v. JOHN CARLISLE ET AL.

---

The facts show that John Carlisle was not the agent of his sisters and niece in the construction of the so-called annex to the St. Nicholas hotel.

But, assuming that he was their agent, it was held:

Where a tenant in common agrees with his co-tenants. to spend a certain sum of money which is placed in his hands for the purpose of improving the common property, and becomes their agent for its expenditure, but expends a much larger sum than was agreed upon, his tenants in common are liable to mechanics with whom he has contracted for work on the improvement, where the mechanics have been misled into the belief that he had authority to spend whatever sum was necessary, by reason of his authority, apparently giving him the power to contract as he did.

The subject of his agency being the construction of an addition to a first class hotel, to be used as a part of and in connection with such hotel, his apparent authority gave the mechanics the right to believe that he was authorized to erect a building suitable to the surroundings and adequate for its destined uses.

But where an agent exceeds his real authority without the knowledge or consent of his principals, and third persons with whom he deals seek to hold his principals for the representations which his apparent authority permits him to make, and a loss has occurred which either the principals or such third persons must bear, the latter must show that they, on their part, made all the inquiries and took all of the precautions to prevent loss which reasonably prudent business men would have taken under the circumstances.

Where the circumstances of their dealings with the agent show that he was acting as the trustee of a trust of a nature which must necessarily be contained in some written instrument, or be a matter of public record, it is the duty of such third persons to ascertain the actual authority conferred on the agent by the terms of the trust. Having failed to do so, and having made no inquiry into the powers of the agent, they are not entitled to the shield of innocence which would otherwise have been their protection.

(Decided April, 1895.)

---

HOLLISTER, J.

The St. Nicholas hotel property, ninety-six (96) feet on Fourth street by one hundred and fifty (150) on Race street, forming the south east corner of these streets, was the property of George Carlisle, who died prior to March 27, 1866, the date of the probate of his will. By his will and the respective successive wills of Maria R. Brown-Sequard, his daughter, Sarah B. Carlisle, his widow, and Clara G. Carlisle, his daughter, the ownership of the property passed to he following named persons in the proportions set forth in the figures opposite their respective names:

John Carlisle, the undivided 228-1372 in fee;

George W. Carlisle, the undivided 266-1372 in fee;

Susan J. Lord, the undivided 89-1372 in fee, and a life estate in the undivided 196-1372;

Fannie C. Mendenhall, the undivided 89-1372 in fee, and a life estate in the undivided 196-1372;

Florence C. Murdock, the undivided 70-1372 in fee, and a life estate in the undivided 196-1372;

Charlotte M. Brown-Sequard, the undivided 4-1372 in fee, and—

Morton Carlisle, the undivided 38-1372 in fee.

These individuals were tenants in common in the property in the shares named at the time of the transactions which gave rise to the actions now before the court.

Mrs. Mendenhall, Mrs. Murdock and Mrs. Lord are daughters of George Carlisle, and have life estates as above set forth by virtue of the devise of their father, with power of appointment of remainder-men by will. John and George W. Carlisle are he sons of George Calisle, and Miss Brown-Sequard is the daughter of Maria R. Brown-Sequard, a daughter of George Carlisle. The interests in fee of the three sisters were acquired through devise of deceased relatives, other than their father as set forth The will of George Carlisle gave his daughters the power to apply to this court for sale of real estate held by them under this will, and of investment of the proceeds in other real estate producing better income whenever, in their judgment, such proceeding was deemed advisable. Other real estate was held by the parties named by he same title and tenure as the St. Nicholas property was held.

After the death of George Carlisle, the management of his large propreties was placed in the hands of John Carlisle, the oldest son, who was given by the other parties in interest, the entire charge of renting the property, collecting the rents, making repairs, and generally of doing, with reference to it in these respects, what an owner would do. He was the general agent of the owners for these purposes, and his relation towards them continud the same down to September, 1892, when he made a general assignment for the benefit of his creditors. For convenience sake he kept an account of receipts and expenditures in the name of "The estate of George Carlisle," although the interests of those whom he represented were not entirely derived from their father, but from the various subsequent devises before referred to. Every six months he made a statement to each of his sisters, showing proceeds of their respective shares of rents and proceeds of personal property belonging to them, and which they had acquired from their father, or by investment after his death through the efforts of their brother, who had the management also of their personal property; and expenditures made for them individually—for all of which John Carlisle was paid a commission of six per cent.

The sisters had implicit confidence in their brother, which, so far as appears, was never abused; and they never inquired into his proceedings, although it appears that about eight years ago Mrs. Mendenhall thought it necessary to employ counsel relative to some controversy between her brother and herself. She never had any other counsel, or authorized anyone to employ counsel for her; although it appears that John Carlisle employed a general counsel for his guidance in the management of the common property, for whose services a compensation was paid by him out of the common receipts.

Carlisle's actual agency never comprehended powers more extensive than such as were necessarily incidental to renting the property, collecting the rents and making necessary repairs. He never in all of the years in which he had been acting for his sisters constructed a building, or made

any extensive alterations, and, so far as appears, there was only one alteration made—the improvement of the stairway and entrance to the Carlisle building—and that was upon express authority of those whom he represented. Among other properties in his charge was the St. Niicholas hotel property, which, prior to its improvement, comprised the lot on the southeast corner of Fourth and Race streets, fronting sixty-one feet on Fourth street. The hotel was operated by The St. Nicholas Hotel Company, of which E. N. Roth was the president, under a lease made by the owners at an annual rental of fourteen thousand dollars. For some years prior to 1890, Carlisle and Roth had frequently discussed the advisability of building an addition to the hotel by constructing a suitable building on the thirty-five feet next east to the then hotel property, to be used as a part of and in connection with the hotel already constructed and in operation on the corner lot. The result of these discussions and negotiations was a proposition in writing, in the following language:

"July 10, 1890.

"Mr. John Carlisle:

"Dear Sir—If you will tear down the old building on the east side of the St. Nicholas hotel, formerly occupied as a glove store, and erect upon the lot, being about thirty-five feet on the south side of Fourth street and extending back about 100 feet, and erect upon said area a substantial seven-story building, according to plans and specifications mutually satisfactory, connecting with the present St. Nicholas hotel, I will rent the new building and the present St. Nicholas hotel at an annual rental of twenty thousand dollars, payable in quarterly installments of five thousand dollars; provided, however, that the present lease of the St. Nicholas hotel shall be canceled and the new lease shall be for a term of not less than twenty years from the completion of the new building.

"In addition to the rental named, I will also pay all taxes and assessments, as provided in the present lease of the St. Nicholas hotel. I will also agree to give my notes for the rental accruing for the first three years, in amounts corresponding to the quarterly payments, and maturing at the respective dates of payment of he rent, if you desire it for your own convenience.

        (Signed),         "EDWARD M. ROTH,

                          "President,

                "The St. Nicholas Hotel Company."

On the receipt of this letter, John Carlisle added:

"Your proposition is accepted.

        (Signed),         "'JOHN CARLISLE,

        "Trustee for the Heirs of George Carlisle, deceased."

It appears that John Carlisle had told his sisters the substance of the contents of the paper. The proposition was made and accepted between Roth and Carlisle, after the latter had seen his sisters relative to the improvement. It appears that Carlisle discussed the subject with Mrs. Mendenhall and Mrs. Murdock at Cincinnati, where they resided, and with Mrs. Lord, at Orange, N. J., her home, in 1889. The advantages of the improvement were laid before them by Carlisle, who advised them that its cost would be about $60,000, and that the increased rental would yield a net return of ten per cent. on the investment. Carlisle was an architect by profession, and had estimated the cost of the kind of building desired by Roth at that figure, and in the summer of 1889, had caused plans and specifications to be prepared by Nash, an architect, under which the original contracts were actually let for $59,000.

At first Mrs. Mendenhall opposed the improvement, but finally all of the sisters assented. Miss Brown-Sequard, residing at Paris, France, then a minor, was not consulted at all; indeed, John Carlisle did not then know that she had any interest in the property.

By the same title as they held their several interests in the hotel property and the thirty-five feet next east of it, the three sisters held undivided interest for life in certain other properties in Cincinnati, among which were the three pieces of real estate, one on Eighth street and the other two covered by buildings respectively known as the Loring House and the Madison House. These life estates were divided under the will of George Carlisle, their fater, which contained this provision:

"But my daughters shall have only life estates in their respective shares of the said residue of my estate, each to hold her share for the term of her natural life only, with the remainder to her heirs in fee, but with power to nominate and appoint, by last will and testament, such person or persons as she may choose as her heir or heirs.

"But inasmuch as it sometimes is desirable, as well for the reversioner as for the life tenant, that real estate should be leased for long terms, or even sold when the proceeds can be immediately and safely and productively re-invested, it is my will that whenever, in the judgment of either of the daughters, it is desirable that any part of the real estate held by her under the provisions of this my will, shall be permanently leased or sold, she may file her petition in the court of common pleas, in the county of Hamilton and the state of Ohio, setting forth the particulars of the lease or sale which she deems it desirable to make, and may thereon make such proof as she may have to offer by affidavits or otherwis, as the court may direct; and if the court shall be satisfied that the proposed lease or sale will benefit the petitioner, and will not injure the reversioners, it is my will that the court order such lease or sale and conveyance to be made; and such lease or sale or conveyance, when so made, shall be binding upon the heirs of such life tenant; provided, that in case a sale or conveyance is prayed for and authorized as 'aforesaid, the proceeds shall be invested in good, productive real estate or well secured rents, under the direction of said court of common pleas, to be held by said petitioner for her life, with remainder to her heirs in fee, but with power in said life tenant to nominate and appoint, by her last will and testament, such peron on as she may choose for her heir or heirs."

In casting about for ways and means with which to construct the improvement, John Carlisle suggested to his sisters that these three properties be sold and the proceeds be invested therein. Proceedings were accordingly instituted in the court of common pleas, by petition signed by the three sisters, filed November 20. 1890, wherein it was alleged that the petitioners were the owners for life of three undivided one-seventh parts of the three pieces of real estate; set forth at length the provision of the will of their father above quoted; that they also hold undivided interest therein through devises to them by their mother, Sarah B. Carlisle and their sisters, Maria R. Brown-Sequard and Clara G. Carlisle; that the Madison House property had decreased in value, and the income from the other parcels was small; "that the present lessee of the St. Nicholas hotel has offered to take a lease on a seven-story building to be erected on said parcel of land next adjoining said hotel, to be used as a part of said hotel, at a very desirable annual rent, provided the owners of said lot would erect said building thereon, and that the income of said building, if erected, would greatly exceed the income from said three parcels of land."

The petition further alleged "that in order to furnish means for the

erection of said building, their brothers, John Carlisle and George William Carlisle, having offered to purchase their interests in said three parcels of land upon a basis of a total valuation of $60,000 for the entire property, which is believed to be enough or nearly enough to pay their share of the cost of said contemplated building on the south side of Fourth street, and that by the sale of their interests in said three parcels of land, and the investment of the proceeds of the sale thereof in the erection of said building upon said lot, which is held in the same proportions and by the same title as said three lots or parcels of land, they would be greatly benefited in their income." They represented also that the change in investment would be advantageous to the "reversioners", and would be in strict accordance with the provisions of the will of their father, and prayed "for permission and authority to sell and convey to their said brothers, John Carlisle and George William Carlisle, all their shares and interests in the three parcels of real estate, and for authority to invest the proceeds of sale thereof in the erection of the building on said lot on the south side of Fourth street."

Thereafter, on November 29, 1890, a decree was entered in said proceedings, wherein "the court further finds that the granting of the prayer of said petition would be in strict accordance with the provisions of said will, and of benefit to said petitioners and their heirs," and it is therefore "ordered, adjudged and decreed by the court that "said petitioners convey their shares and intersts in said real estate to said John Carlisle, in fee-simple, on a basis of a total value of said premises in the entire sum of $60,000, upon payment by them of their proportionate shares of said valuation, and that the proceeds of the sale thereof be invested in the erection of a building adjoining to the present St. Nicholas hotel, on the corner of Fourth and Race streets, in Cincinnati, prayed for in the petition herein."

This decree is peculiar. In the first place, the petitioners owned the undivided 248-1372 of the real estate in fee, and 3-7 or 588-1372 for life only. The entire proceeding had, and could only have, relation to 588-1372 of the property, and the decree could and did only operate upon that much of it. The conveyance of the undivided 248-1372 required no order of the court at all.

In the second place, it clearly provides that John and George William Carlisle were to pay their respective shares in cash as a condition to which the execution of the conveyance was subsequent, and the "proceeds of the sale thereof," meaning, doubtless, the entire undivided interests of the sisters and the interests of the brothers, were to be invested in the building; yet the only thing actually sold was a small part of the whole, and represented but about $26,000 out of the total $60,000 of the valuation; and, thirdly. there was no express appointment of a trustee to spend that money. This is unusual. It is the duty of the court, in proceedings of this kind, in dealing with the interests of life tenants, of reversioners and remainder-men, to protect the fund and its proper application by the appoinment of a trustee whose fidelity is insured, or the consequences of whose want of fidelity saved, by the repuirement of a bond. Yet the proceeds of the sale of these undivided interests were none the less a trust fund, ordered to be invested by a court of equity, although in fact no trustee was appointed in express terms.

The sisters made a deed to John and George William Carlisle, who did not make any payment therefor, nor did they pay to any one their proportionate shares of the property on the basis of its $60,000 valuation.

From the time of the execution of the deed, on the day or the date of the entry of the decree, November 29, 1890, until July, 1893, at which

time the first in number of the suits now in consideration was instituted, the sisters had no knowledge whatever of the subsequent transactions of John Carlisle relative to the improvements, did not go to the building, were not aware of the nature of the structure or the character of the work done in it or on it, excepting so far as its external appearance would betray its nature to a passer-by on the street. They did not know who had taken contracts, nor their nature or extent, and gave no attention whatever to the matter, and made no inquiry concerning it.

In the spring of 1891, John Carlisle contracted with the plaintiffs and others to do certain classes of work; with all of the plaintiffs, excepting Shroder & Company, he contracted in writing; and in all the contracts, excepting one, he signed "John Calrisle, trustee." With the James L. Haven Company he signed the contract, at its request, with the words "John Carlisle, for the heirs of George Carlisle, deceased." In each of the written contracts the party of the first part was the estate of George Carlisle.

The Thomas Gibson Company did the plumbing; Lawrence Grace, the plastering; James Griffith & Sons, the carpenter work; Isaac Graveson, the stone work; The Laidlaw & Dunn Company furnished certain machinery, and J. B. Shroder & Company furnished hardware, locks, etc.

Never before had Carlisle made written contracts for any work in which his sisters had an interest, so far as appears in evidence in these cases. Some time after work was commenced, and the new structure was well under way, Mr. Roth, desiring some additional work done, not originally contemplated, suggested the additions and changes to Mr. Carlisle, who demurred on the ground that the building had already cost more than was contemplated, whereupon Mr. Roth said that he would pay all of the cost of the building in excess of $75,000. At the time the new building was contemplated and during its progress, John Carlisle was engaged in large enterprises. He constructed a railroad in Kentucky, and was a large stockholder in and financial backer of the Great Western Mining Company, a concern organized to develop the coal lands contiguous to his railroad. For some time prior to the commencement of the improvement, he had largely used his credit to raise money for carrying on his private enterprises. When his sisters' interest in three pieces of property were deeded to him and his brother, he borrowed $46,000 at once on the property, a large part of which he used for his own purposes, and also similarly used $40,000 in rents advanced by the hotel company, a part of the three years' rent which Roth in his proposition had offered to advance, to be evidenced by promissory notes.

As the work progressed he paid to the various contractors sums of money, whenever he had any, but for the most part he gave the notes signed by himself, excepting in the case of The James L. Haven Company, he signed "John Carlisle, for the heirs of George Carlisle, deceased." The notes were renewed from time to time as they became due, on payment of small sums on account, and were sometimes taken up by payment and sometimes paid by money borrowed by him from those to whom the notes were given.

He collected all of the rents of the Carlisle properties, amounting to about $50,000 annually, and deposited the rents, with all the other moneys coming to him from all sources, in his individual account at bank. He paid his sisters their net shares of the rents by his individual check, and all payments to all persons to whom he owed money were made in the same way. The cash paid to plaintiffs on account of their work was by his individual check.

The improvement was finished about November 1, 1891, at which time

a large part of its cost was unpaid. This balance was represented by his notes, most of which had been discounted by those to whom they had been given. His resources were now heavily taxed, but his credit was still good.

On July 5, 1891, while the improvement was in progress, the new lease was executed, signed by the hotel company and by John Carlisle, George W. Carlisle, Susan J. Lord, Florence C. Murdock and Fannie C. Mendenhall. The lease was for twenty years, at $20,000 per annum, the rental to begin September 1, 1891; but Carlisle and Roth agreed that the rental should not, in fact, begin until the new premises were ready for occupancy, which was afterwards agreed to, November 1, 1891.

On July 10, 1891, two days after the execution of the lease, Roth, in partial pursuance of his agreement with Carlisle, gave him eight notes, of $5,000 each, dated July 10, 1891, and maturing respectively, at the times when each quarter's rental was due under the lease, beginning September 1, 1891, and all made to the order of "John Carlisle, trustee." On each of these notes Carlisle got the money by discounting them with various persons, and used the proceeds in his business, excepting some $15,000, which he paid on account of the work done in the improvement.

His sisters never knew that he got the notes, although they knew that Roth had offered to pay rent in advance for three years, to provide the $60,-000 the building was to cost, should Carlisle not be able to use the property taken by him from them at that agreed valuation.

In March, 1892, Carlisle conveyed to Loretta B. Gibson all of his interest in the St. Nicholas property for $100,000. The deed was not recorded until long after the building was finished, but was held by this court effectual to pass the title as of the date of execution. This money also went the way of all money coming into Carlisle's hands—to pay his individual obligations. His credit continued good until August, 1892, up to which time he was able to discount his paper; but the burden of raising further moneys, and of carrying the load of debts he had contracted, becoming too great to be borne longer, he made an assignment September, 1892, for the benefit of his creditors, having lost in his various enterprises more than $700,000.

Up to the time of his assignment, Carlisle had paid to various contractors, on account of work on the improvement, nearly $70,000. The total cost was $94,319.88, leaving about $26,000 unpaid, most of which is represented by the balances claimed by the plaintiffs in these suits.

It is claimed by the plaintiffs that John Carlisle was the agent of his sisters and niece in the construction of the improvement on the property in which they, with him and George W. Carlisle, were the tenants in common, and that the defendants were jointly liable to them. The plaintiffs show that after the death of George Carlisle all of his property was placed by the devisees in care of John Carlisle; that he attended to the renting of the various pieces of property, collected rents, made all necessary repairs, kept his accounts in the name of "The estate of George Carlisle," employed counsel at a small annual retainer which he charged to the general account, was regarded by his sisters as a good man of business, and had their implicit confidence. This relation continued for more than twenty-five years. Every six months he rendered to them an account showing receipts and expenditures. These facts, together with the claim that the proceedings to obtain an order to re-invest the proceeds of sale of the other property show that John Carlisle was adopted as the means or agency through which the sixty thousand ($60,000) dollars was to be re-invested, are made the basis of the charge that he was the agent of his sisters and his niece in the construction of this improvement.

The claim, broadly stated, is that Carlisle was looked to by his sisters in every matter of business which they did, whether it related to the property held by them in common or not; that they surrendered to him their judgment, and from their confidence in him believed that he could and would manage their affairs better than they would, and that, in such belief, they placed in his hands the entire management of this improvement for them ; that they had a common interest in the fund, and that they had a common interest in the profits to result from its investment; that the entire enterprise was a joint one for their joint benefit; that they had ratified everything he had ever done for them up to that time, and as evidence of their ratificaiton of the proceedings on this occasion, that they had signed the new lease of July 10, 1891. An illustration is made of the fact that the money for a new house built by Mrs. Mendenhall a short time prior to the improvement was provided by him to James Griffiths & Sons, the contractors. And the plaintiffs claim also that the word "trustee" after his name in the contract means "agent," and that its use is a declaration by him of the existence of an agency, and in connection with the other evidence in the case, is competent evidence of that relation. And it is shown that prior to the improvement, Carlisle was accustomed to receipt for rent as trustee, and that the notes for rent in advance given him by Roth, were taken by him as trustee. And it was also shown that the contracts were made by him in the name of the estate of George Carlisle as party of the first part. If the facts supported this theory of the plaintiffs, the court would be warranted in finding that an agency existed, and that of broad and general powers. There are, however, objections to it.

1.   It is undoubtedly a fact, that up to the time the improvement was undertaken, John Carlisle only embraced the power to rent the property belonging to himself, his brothers and sisters in comomn, to collect the rents, and to make necessary repairs, and with respect to these subjects of agency he had general powers; but it appears that he had never constructed a building for his sisters, or had undertaken any work on the joint property involving any considerable expenditure.

2.   It is true that the payments of the cost of Mrs. Mendenhall's house were made by him, but it appears that he had money of hers in his hands arising from the sale of securities bequeathed to her by her father, or bought with personal property bequeathed to her by her father. Carlisle had nothing to do with the building of the house excepting to pay out Mrs. Mendenhall's money for her, already in his hands; and it appears, also, that the contractors, James Griffiths & Sons, plaintiffs also in one of these cases, took the notes of Charles Mendenhall, her husband, for a portion of the work, which notes were taken up by Carlisle with Mrs. Mendenhall's money.

3. Plaintiffs' claim that the use of the word "trustee" indicated that Carlisle regarded himself as an agent; that he had used the word in receipts for rent from the hotei company for several years prior to the improvement, and that he had the notes given by Roth for advance rent made to him with the same descriptive addition.

Ordinarily, the declarations of an alleged agent are not admissible for the purpose of proving the agency. (Mechem on Agency, S. 100). But assuming that there is sufficient evidence, aliunde, in which case such declaration becomes admissible, however slight it may be, (McClung v. Spotswood, 19 Ala. 165, 170; Railroad Company v. Henlein, 52 Ala. 606), what does the declaration mean? The words "trustee" and "agent" are not interchangeable. An agent acts for another; a trustee for himself as principal. The most, it would seem, that could be claimed would be that

its use indicated that Carlisle considered himself as acting in the same capacity when the contracts were made as when he collected rents. Now, when Carlisle collected rents, he was not a trustee in any sense of the word, but an agent for that purpose only. The plaintiffs contend that when Carlisle signed as trustee, he either was representing that he was an agent, or he was endeavoring to deceive. This alternative is not so imperative as claimed. To some extent he may well have regarded himself as a trustee for the expenditure of the proceeds of sale, of the three-sevenths part of the real estate, that $25,000 in which his sisters had a life estate. It is true the court did not expressly appoint him, but the decree did say that the proceeds of sale should be invested in the new building.

Those proceeds were in the hands of John Carlisle, and were a trust fund which he could legally expend only in building this improvement. The necessary result of the proceeding was the creation of a fund to be invested "under the direction" of the court. Whoever took the fund assumed to spend it under that direction. John Carlisle, as to that $25,000, as between himself, the court, the life tenants, and whomsoever might become the heirs of the life tenants upon their designation by will, was, on the face of the proceedings and by his own declaration, the trustee of an actual trust; and, so far as appears, he occupied no other trust relation to any of his family or to anyone else. He had been executor under his father's will, but had filed his final account prior to the court-house fire in 1884. He signed the contract with The James L. Haven Company "for the heirs of George Carlisle" at the request of that company, and this is claimed to be evidence that he was acting as agent.

Now, it will be observed that outside of the three-sevenths interest sold in the proceedings referred to, the three sisters did not own any interest as heirs of George Carlisle at all, having become the owners of 248-1372 through various subsequent devises, represented by about $11,000 of the $60,000, and Miss Brown-Sequard's 4-1372 and Morten Carlisle's 38-1372 do not appear to have been taken into consideration at all. They were not heirs of George Carlisle in the sense that they took any interest as his heirs at law or devisees, and for aught that appears to the contrary, Miss Brown-Sequard and Morton Carlisle are still the owners of those interests in the three pieces of property. Outside of the trust, John Carlisle and his brother were the only heirs of George Carlisle who had any interest in those properties by direct title from George Carlisle. They were the owners in fee of the undivided 494-1372, more than one-third.

So, strictly speaking, Carlisle was not acting for the heirs of George Carlisle in the sense he was investing $60,000 for them as heirs, and the use of those words and the designation of the party of the first part as the estate of George Carlisle are, on its face, misleading; but, in a broad sense, from his standpoint, he was acting in behalf of individuals who bore that relation to George Carlisle, in that he was putting money which had been partly theirs and partly his, and all originally derived from George Carlisle, into another investment in which they had interests in common  It must be remembered that at the time the contracts were made, Carlisle's credit had never been questioned—was, in fact, good for a year and a half, and that he believed himself responsible for all of his engagements. The declaration was partly absolutely true, and partly untrue, in a strict sense. But, if entirely true, it would not seem such a declaration as would, with the other testimony in the case, necessarily bind the defendants to the relation of principal and agent; if false, the defendants, other than Carlilse, were not responsible. That the expression was misleading there can be no doubt, and this fact will be referred to later;

but that by its use Carlisle necessarily willfully designated an imposition on the plaintiffs, is not warranted by anything in the evidence.

4. It is true, that the new lease was executed July 8, 1891, when the work was nearing completion. This was, however, only carrying out the agreement between Carlisle and Roth of the year before, the terms of which were known to the sisters. The new lease was in strict accordance with Roth's proposition. The sisters did not know but that everything was paid for. They were not told that Carlisle was building on credit, or that he had given notes. The fact that they did not inquire, is evidence that they had no suspicion of the actual state of affairs.

It appears that on December 9, 1893, the three sisters executed separate receipts to The St. Nicholas Hotel Company for their respective shares of the rent accruing under the new lease for the quarter ending December 1, 1893. In these receipts appeared the following recital:

"I do futher acknowledge and agree that the eight notes executed by The St. Nicholas Hotel Company, by Edward N. Roth, president, each note dated Cincinnati, July 10, 1891, and each being for the sum of $5,-000, payable to the order of John Carlisle, trustee, and being for rent of the St. Nicholas Hotel property, on the corner of Fourth and Race streets, in the city of Cincinnati, * * * were received and accepted by John Carlisle, as trustee, for the collection of rent, for my interest, as far as I had any, in the St. Nicholas Hotel property; and I do hereby relinquish any and every claim for rent, so far as my interest appears, to said the St. Nicholas Hotel property during the period for which said notes were given; and do hereby confirm the authority of said John Carlisle, as trustee, for the collection of rents only, to receive and accept from said The St. Nicholas Hotel company the sum of fourty thousand dollars for rent for the period beginning with December 1, 1891, and ending with Deceember 1, 1893."

This is certainly no ratification of any other agency than an agency to collect rent. It is probable that Mr. Roth would not pay further rent until the question of Carlisle's authority to take the notes was settled He might well take that position, for it appears that at least three holders of those notes were required by him to guarantee to him their ownership of the notes and their right to collect them. The guarantees were in writing, and contain the following:

"The St. Nicholas Hotel company admits that it owes the amount of said notes; but it has been given out by some of the persons for, whom John Carlisle acted as trustee that he did not have authority to discount said notes." It s significant that one of the papers was dated March, 1893, and one in May, and defendants did not then know of the existence of plaintiff's claim, or that the improvement had not been paid for. Carlisle did not, in any view of the case, have authority to discount the notes and spend the sixty thousand ($60,000) dollars. It will be remembered that Roth, with the knowledge of the sisters, was to let him have sixty thousand ($60,000) dollars in notes, should he not be able realize on the property. But it was eminently proper that the sisters should acquit Roth for the rents for those two years, for Carlisle had in fact paid them the rents as if he had collected them each quarter. They had received the rents, and common honesty would have prevented their double payment, if indeed it could been enforced in the law.

6. But the strongest arguments against plaintiff's claim of agency lie in the following facts which defendants urge as showing that John Carlisle's acts were entirely independent of them, and that they consequently can-

not be made liable: First—The proceedings by which the three pieces of property were sold, show that it was agreed that the improvement would cost about sixty thousand dollars; that the property was worth abount that sum; that John and George W. Carlisle were willing to take it at that figure and put sixty thousand dollars into the improvement, and that the object to the proceeding was to obtain a change in investment of an exact sum.

Second—Carlisle borrowed forty-six thousand dollars on the property, and sold h's equity of redemption in one piece for forty thousand dollars, thereby obtaining fifty thousand dollars out of the property. He says: "The property sold for less (than sixty thousand dollars), but I didn't charge my sisters with the deficit. I did not, because I had taken it at a certain price, and I thought I was responsible for it. If it had sold for more, I should not have given them credit for it." He knew, prior to November 1, 1891, that the figure which he had obtained on the property was ten thousand dollars short of 'its agreed value, yet for nearly a year he continued to pay his sisters their exact proportions of rent without deducting at least enough to make him whole, and without even letting them know that he had obtained only fifty thousand dollars. This fact is entirely inconsistent with the agency on his part, and is strong evidence that he was an independent contractor.

Third—Carlisle actually put in nearly seventy thousand dollars in cash, yet he never informed his sisters that the property had yielded but fifty thousand dollars.

Fourth—When he discovered that the improvement involved a greater expenditure than sixty thousand dollars, he asked Mrs. Mendenhall to assist him by contribution, which she declined to do.

Fifth—Carlisle and Roth made a settlement of the amounts coming due to Carlisle under the agreement whereby Roth was to pay all of the expense of the improvement over seventy-five thousand dollars. With Roth's knowledge and consent, Carlisle paid, before his assignment, some of his individual debts to C. B. Matthews and others with the money so obtained. This tends to show that Carlisle and Roth both thought that the money was Carlisle's individual property.

Sixth—In almost every instance Carlisle made his own individual notes to the contractors for work done on the improvement. Many of them he paid—on most he paid small sums and renewed, and on all he is liable. This tends to show that he regarded himself from the beginning as the person reponsible for the work. The facts show that he undoubtedly expected to pay all of his notes, and would have done so if he had succeeded in weathering the financial storm, which, during all of the time of the improvement, he was seeking to avert.

Seventh—Mrs. Mendenhall and John Carlisle both testify that he and his brother were to undertake the work independently. Mrs. Mendenhall says that when the subject was broached to her, she was opposed to the improvement, and that it was under consideration for several months. She testifies that her brother said to her, "that if I would sell my property, these three pieces, to my brother, he would put up the improvement.

"He told me that if I would sell my portion of these three pieces of property to him, and my sisters agreed to the same, he would put up this improvement, he and my broter."

Carlisle testifies: "I told them (his sisters) that when they deeded this property to us, that we would put up the St. Nicholas, and build the St. Nicholas improvement, and we needed this to raise the money with which to do it, and if we had it in our own hands we could work it so, and

we would take and be responsible for the building of the St. Nicholas, if they would give us the property.'' Now, while the decree evidently contemplated a cash sale to the brothers, yet it is quite clear that the parties thereafter did not act upon that requirement. When the sisters turned their shares in the real estate over to their brother, it was as between them a closed transaction, and it was immaterial to them whether the property sold by their brothers or not, or whether sixty thousand dollars, or more or less, was realized on the sale. They, therefore, never inquired, and having absolute confidence in the integrity and judgmnet of their brothers, they had reason to believe that the improvement would be suitable for the purpose for which it was intended, and had no occasion to interest themselves further in the manner or extent of the construction. Carlisle's conduct shows that he regarded the transaction in the same light.

Considering all of the facts as evidenced by the conduct of the parties, the fair weight of the evidence is with the defendants, and, adding to that the testimony of Mrs. Mendenhall and John Carlisle, the conclusion is irresistible that the brothers contracted with their sisters to make this improvemnt in consideration of their conveyance to them of their shares of sixty thousand dollars worth of property, and that the brothers in their own behalf contracted with the plaintiffs. Under these circumstances the defendants are not liable. (Conway v. Crook, 66 Md. 290; Proctor v. Tows, 115 Ill. 138; Durano v. New York & Norwalk Steamboat Company, 4 N. Y. S. 386.)

In Webb v. Peirce, 1 Curt. 104, the question was as to where the liability, as between the owner and the master of a vessel between whom was an agreement by which the master bound himself for supplies, lay. Says Judge Curtis: ''If the private arrangement between the owner and the master be of such a nature as to bear the relation of principal and agent, still existing between them, it is undoubtedly true, that the owner would be bound by all contracts respecting the navigation and employment of the vessel, within the usual scope of the master's authority, notwithstanding a secret arrangement between them, that the master should not thus bind the owner. But if the arrangement between the master and owner be such that the relation of principal and agent does not exist there is no reason for the application of this principle of the law of agency, simply because there is no agency in the matter.'' And it is not material that the defendants receive the beneficial results of plaintiff's labor and material. Starkweather v. Goodman, 48 Conn. 101. In no sense are the defendants' partners each bound as principal by the act of the other as agent, which is the real test. (Farmers' Insurance Company v. Ross, 29 Ohio St. 429, 431; Harvey v. Childs, 28 Ohio St. 319, 322; Farrand v. Gleason, 56 Vt. 633, 636.) It is also held that a tenant in common cannot bind the other tenants in common for improvements, which he, without their consent, erects upon the premises. (Coakley v. Mahar, 36 Hun. 157; Stevens v. Thompson, 17 N. H. 103; Crest v. Jack, 3 Watts, 238; Dech's Appeal, 57 Pa. St. 467; Dobson v. Kuhnla, 20 N. Y. 771.)

But assuming that Carlisle was the agent of the defendants, it would not seem that a different result would be reached.

No authority need be cited to support the proposition that the agent can bind the principal only when acting within the scope of his authority. The only exceptions to this rule are in cases where the principal by some act, neglect, omission, or acquiscence, has led others to believe that the agent's authority was more extended than it in fact was. The exception rests on the principle of estoppel. Now, it is not claimed in this case that the defendants, the sisters, by positive act of theirs mislead or at-

tempted to mislead the plaintiffs, but that Carlisle's apparent authority resulting from and directly incidental to his actual authority, led the plaintiffs to suppose that if he was an agent at all, his powers comprehended the construction of a suitable building for the purposes for which it was intended, and that the building constructed was such a building, and, so long as Carlisle kept within reasonable limits of expenditure, they had no reason to inquire what sum he was in fact authorized to spend.

The principle is laid down by Mr. Mechem in the consideration of the subject of secret liimtations:

"The principal may impose on it (the agent's authority) as many limitations and restrictions as he thinks best, and these limitations and restrictions are binding upon third persons if they have notice of them, or might, with reasonable diligence, have ascertained them. The principal cannot, however, expect third persons to have notice of limitations and restrictions which are, in their nature, secret and undisclosed. And, while persons dealing with the agent are bound to know the extent of his authority, they may reasonably take the visible and apparent interpretation of that authority by the principal himself as the true one, and the one by which he chooses to be bound. It is, therefore, the rule of law that the rights of third persons, who have reasonably and in good faith relied upon the apparent authority of the agent, cannot be prejudiced by secret limitations or restrictions upon it, of which they had no notice." Mechem on Agency, sections 708, 279, 283.

And the rule is the same whether the agency be special or general.

Bryant v. Moore, 26 Me. 84; Towle v. Leavitt, 23 N. H. 360; Mechem on Agency, section 283, and cases cited in note 1; Mechem on Agency, section 709.

"The authority of an agent being limited to a particular business does not make it special; it may be general in regard to that as if its range was unlimited. Anderson v. Coonley, 21 Wend. 279.

So far as this general rule is concerned, it is immaterial whether an agency be regarded as a general agency, or special agency, as applicable to the case of the kind under consideration. Granting, then, that Carlisle had authority to build some kind of a structure on this lot, those who dealt with him might, under ordinary circumstances, fairly assume that his authority was broad enough to comprehend the construction of this building; for, while it appears that the work was of the best character and was generous in its scope and detail, yet, it was not extravgant for the requirements of a modern first-class hotel. The sisters actually knew that a building was in process of erection, and if they gave their agent authority to construct it, they must be held to know that it was only such a building as naturally would be constructed in such a neighborhood and for such a purpose.

The principle on which this conclusion rests is, that where one of two innocent persons must suffer for the fraudulent or unauthorized act of a third, the loss must fall on him who has permitted the act to be done.

But one claiming the protection of this rule must bring himself within its spirit.

The facts show that Carlisle made written contracts with each of the plaintiffs excepting The James L. Haven Company and J. R. Schroder & Co., which he signed "John Carlisle, trustee," and that the party of the first part in those written contracts was the estate of George Carlisle. He never had before that time made a written contract with anyone on behalf of his sisters. The plaintiff did not know he had ever signed his name in that way. While implied trusts are sometimes raised by operation of law,

they are usually raised in him whom the law makes the trustee on princi-
ples of natural justice, and as against his claim of individual benefit.

It was the trustee himself that declared that he was a trustee. While
it would be probably going too far to say that the declaration necessarily
meant that he who made it was a trustee of an express trust, yet it could
not be taken by the one to whom it was made to mean other than that he
who subscribed himself was a trustee of some sort; and the kind of trustee,
it would seem to me, which such person must necessarily infer that he was,
would be either that he was acting as administrator of an estate or that he
was acting as executor under a will.

The word "estate", in law, has a clear and distinct meaning. It is
applied to the property which is left by one who dies, upon which an ad-
ministration shall be had under the direction of the law, or under the di-
rection of a will which the person who leaves the property has seen fit to
make before his decease; or it may be applied to that which is left for ad-
ministration when one has become insolvent, and his property is to be dis-
tributed to his creditors. There is no other technical meaning to it, so
far as I know. These contracts were made in the name of the estate of
George Carlisle, as party of the first part, and were signed by John Car-
lisle, trustee, which meant to anyone with whom he was dealing that he
was the trustee of the estate of George Carlisle. Now, it needs no extend-
ed argument or authority to show that an administrator has no power
whatever to construct buildings for an estate which he represents. An
executor might. A trustee under a will might. But in so doing he could
only legally construct buildings by virtue of the express authority which
was set out in the power which he had received either as trustee or as ex-
ecutor, and if he had received power as trustee or executor, he could only
receive it under a will, or a written power, if he were acting as trustee
merely and not as executor. So that, in one case, if he were acting as ex-
ecutor, it would be under a will which was of record, and which must
necessarily be of record in the probate court; and if he wer acting as trus-
tee under some express power of trust, it must be under some written pow-
er, which would give him the authority to construct buildings. So that,
in any event, it must have been brought home to the plaintiffs dealing
with John Carlisle, that he was acting under some express authority, and
that that express authority must be found somewhere, either in a writing,
which, under ordinary circumstances, he, as such trustee, would hold, or
that he was acting as executor or trustee under a will which would be
of record in the probate court. The maxim which I have referred to relative
to the innocence of parties who deal with an agent exercising apparent au-
thority, necessarily contemplates that there are, or were, in the final re-
sult of the application of the maxim, an innocent party and a negligent
party. The apparent authority which would bind a principal binds him,
because there has been some act of commission or omission on his part
which the law would not permit him to deny that he had affected the rights
of other innocent persons; "but," says the Supreme Court of Michigan,
"before the maxim can be applied to the case, it is necessary to determine,
not only that fault is imputed to the defendant, but also that the plain-
tiff is free from nelgigence. There must be one innocent party and one
negligent party before the requirements of the maxim are answered. And
the conduct of the plaintiff is, therefore, as important as that of the de-
fendant." (N. Y. Iron Mining Co. v.. Negaumee Bank, 39 Mich. 644, 656).

Now, the plaintiffs claim that while they did not know the names
of the various tenants in common for whom they charge that Carlisle was
acting as agent, yet they knew in a general way that there were others in-

terested for whom Carlisle was acting. But they did not inquire into his authority; they did not even attempt to ascertain who the principals were, or how many persons were involved , nor into their financial responsibility, nor did they make any attempt whatever to find out what the trust was, nor the powers embraced in it, how it arose, or who were the beneficiaries under it. If they had, they would have quickly found from the record of the probate court that John Carlisle was not acting as executor or trustee under a will, and if they inquired from Mrs. Mendenahall or Mrs. Murdock, who were in the city all of the time, they would have discovered that proceedings had been taken whereby their agent was given sixty thousand dollars of his own and theirs to be expended in this building, and could have seen what were the exact powers which John Carlisle had. They at any rate would have discovered what power he did not have, or that he had no further power than that contained in the record of these proceedings, and they could then have declined to proceed until they knew that the principals were willing to be bound for further sums. "Had they observed this precaution, it may be that the house would not have been built—it is certain they would not have been losers. As it is, their loss is the result of their own negligence, remarks Mr. Justice Schofield, in Proctor v. Tows, supra, a case similar in many respects to the case at bar.

The principle is illustrated by the language of the author in Wharton Commentaries on Agency, section 137:

"I may be careless in exhibiting confidence in an agent, yet this does not make me liable to a third person, who, in dealing with such agent, fails to apply the diligence usual with good business men under the circumstances. The case becomes, in such view, one which is called contributory negligence. In other words, the casual connection between my negligence in giving color to the employment of A., and B.'s loss by dealing with A., is broken by B's own negligence in trusting A. without due inquiry." See Hurley v. Watson, 68 Mich. 531; Dozier v. Freeman, 47 . Miss. 647; Attwood v. Munnings, 7 B. & C. 278.

While none of the cases exactly fit the case at bar, yet the principle is applicable, and it would seem that whenever there is anything in the transaction which would put a reasonably prudent business man upon inquiry as to the powers of the person with whom he is dealing, if he suffers loss by reason of his failure to make such inquiry, he alone must bear it.

The general rule is, that when one deals with an agent, he must, at his peril, know of the existence of the agency and of the extent of the agents' powers. It is especially true that where the power must necessairly be contained in a written document, that the inquiry must be made, and the failure to make such inquiry will prevent the plaintiff, if he has become injured, from recovering, and this by reason of his own negligence in not making such inquiry. As the author says: "So, where the nature of the authority is such that it must have been conferred by written instrument, or must be a matter of public record, the party dealing with the agent must, at his peril, take notice of this fact, and ascertain whether the instrument on record is sufficient for the purpose." ' (Mechem on Agency, sections 291-2-3, and the cases there cited.)

That inquiry was provoked in the mind of one of the plaintiffs by the face of this written contract, or by the representation of John Carlisle that he was acting for the others, is made apparent by the position taken by The James L. Haven Company, which, before they were willing to make a contract, required that John Carlisle should declare that he was acting for the heirs of George Carlisle, and that he did so declare, by signing,

"'John Carlisle, for the heirs of George Carlisle." But that was not sufficient. The mere declaration of the agent that he was acting for the heirs of George Carlisle would not be sufficient to satisfy the inquiry of a reasonably prudent business man dealing with one under such circumstances. The conclusion must be that an inquiry was required of the plaintiffs, and a proper inquiry would have resulted in their ascertaining the exact situation. They then can no longer shield themselves under the cloak of innocence which otherwise would have been a protection to them. So, even if John Carlisle was the agent of the defendants, the plaintiffs, in my judgment, cannot recover.

In this view of the case, on these two grounds, it does not seem necessary to go into the other grounds of defense, all of which present very strong features. One is that an agent who has been given a fund to expend for the principal, furnished with the cash, has no authority to bind his principal by purchases on credit. The other is that the agent has no right to bind his principal by the giving of his individual note. A strong reason for believing that the plaintiffs thought that they were, in fact, dealing with John Carlisle, is that they took his notes for a period of two years, most of them his individual notes, which were renewed from time to time —occasionally paid, and some renewed under circumstances of extreme suspicion, which would have put a reasonably prudent man upon inquiry as to the right of John Carlisle to make notes in that way, if they thought he was going to bind anybody else by them. A reasonably prudent person, had he not thought that he was dealing with John Carlisle individually, and if he did not believe that John Carlisle was good for the debts that were made, would have inquired from those whom he represented if such a person thought that John Carlisle represented them, what authority he had to give notes in this way for a long time; and if he had inquired, the sisters would then have ascertained a year before his failure, because the building was completed the first of November, 1891, and he did not fail unitl September, 1892, and would then have had the opportunity, if they were in fact liable or these additional expenditures of Carlisle, of recouping against John Carlisle and of compelling him to make good to them the amount which he was not authorized to expend. For it appears that up to August of 1892 his credit was perfectly good and he was borrowing money all the time, and within that year he could have paid them such sums as he had improperly expended—more than they had authorized him to expend; and I therefore feel sure that on the two grounds stated, and on further grounds into which I have only gone to a slight extent so far as this opinion is concerned, that the plaintiffs have no cause of action whatever.

Judgment is rendered for the defendants.

To which counsel for plaintiffs each separately excepted.

---

(Cuyahoga County, Court of Common Pleas.)

## THE CITY OF CLEVELAND v. THE CLEVELAND ELECTRIC R. R. CO.

---

On the 22nd day of July, 1875, the City of Cleveland, by ordinance, granted to the Broadway & Newburg St. R. R. Co., a corporation, the privilege of constructing and maintaining a street railway in the street of Broadway in said city. Among other conditions were this, that the company should pave, or pay for the paving of, the space between its rails making for a double track 10 feet. Subsequently, and while the grant was still in force, the city, by ordinance passed December 22nd, 1892, undertook, and did require the street railroad company to pave 16 feet of the street instead of 10 feet.

*Held,* that under section 2 of Article 1, of the Constitution of. Ohio, as well as the act of the legislature passed April 21st, 1890, and the ordinances of the city passed prior to December 22nd, 1890, the ordinance of December 22nd, 1890, and the ordinance of June 13th, 1892, and the act of the legislature of April 21st, 1890, were all valid and constitutional, and the right of the city to require the company to pave 16 feet instead of 10 feet did exist, and it was but a reasonable exercise of the reserved power under the constitution of the state and the ordinances of the city.

---

ONG, J. (orally.)

The case of The City of Cleveland v. The Cleveland Electric Railway Co., was at the last term of this court tried to the court, jury being waived the question being entirely, or almost entirely, one of law.

The petition of the city avers substantially, that it is a municipal corproration organized under the laws of the state of Ohio, and a city of the second grade of the first class; that the defendant is a corporation organized under the laws of Ohio, being a street railroad company formed on or about the 1st day of April, 1893, by the consolidation as provided by the statutes of the state, of The Broadway & Newburg Street R. R. Co., The East Cleveland R. R. Co., and The South Side R. R. Co., each of which were incorporated railroad companies at, and prior to, such consolidation, and each owned and operated various lines of street railway in the city of Cleveland, in pursuance of ordinances passed by the council of said city at various times.

The defendant, The Cleveland Electric R. R. oC., as the successor of the several companies, is now, and has been since the consolidation, operating all of the lines of said railroad companies, and is liable to perform all the obligations of said constituent companies in respect thereto.

The City further says that on the 22nd day of July, 1875, the council of the city passed an ordinance granting permission to the Broadway & Newburg Street R. R. Co. to coustruct and operate a street railroad, with the necessary turnouts, etc., in the city of Cleveland, commencing on Union street on Broadway, running south on Broadway to Mechanic street, now Miles Park avenue, for and during the period of twenty years from and after the 27th day of July, 1875, subject to the conditions and limitations set forth in the ordinance, among which are, "a railroad should consist of two tracks over certain portions of the territory above named;" and that "the company should be required to pay for the paving of the same with material as the rest of the street is paved with, and the space between the rails of each of its tracks and turn-outs; that such paving by the company should be done to the satisfaction of the board of improvements, and that in case of failure or neglect on the part of the said company to perform all and singular the conditions of the ordinance, together with all and singular the further and future ordinances of the council in relation to said road, then the privileges granted should become null and void, etc."

The city futher says that said railroad company, The Broadway & Newburg St. R. R. Co. accepted the conditions of said grant, and constructed a railroad in Broadway under and in pursuance of the ordinance.

It futher says that on the 15th day of October, 1883, the council passed an ordinance permitting the company to extend its lines over certain territory named in the petition, and provided for the compliance with that ordinance, as well as all conditions of the former ordinance making the grant. Then the plaintiff says that on the 1st day of July, 1889, the council of the city passed an ordinance granting permission to the Broadway & Newburg St. R. R. Co., to operate its entire line of street railroad, and all extensions, by electricity as a motor power, and said grant should terminate twenty-five years from and after the passage of the ordinance.

The ordinance further provided that nothing contained therein should in any wise release, or relieve said ompany from compliance with all other ordinances relating to said railroads then in force, or which might thereafter be adopted by the city council, including all amendments hereto and thereto; that again, on the 20th day of January, 1890, the city council, by ordinance, granted permission to said Broadway & Newburg St. R. R. Co. to lay an additional track on Broadway, and to maintain the same and any extension thereof; and that such grant should expire with the grant passed July 1st, 1889, and provided that the company should comply with all the provisions and conditions, of former, as well as the present ordinance, in relation to street railroads.

Further, on the 4th day of December, 1866, the council of said city passed an ordinance prescribing the terms and conditions of street passenger railways within the City of Cleveland, and sets forth in its petition Sections 1, 13 and 17 of such ordinance, which are general in their nature, and section 1 provides "that all companies or individuals laying down railroads in a street of the city shall be guided, governed and regulated by the following conditions and such restrictions as the council may thereafter pass."

Section 13 provides "that the companies shall perform all and singular the conditions of the ordinance, together with all and singular the further and future orders of the council in relation to said railroad."

Section 17 makes the entire act applicable to all street railroads within the city. And further, that the City Council passed an ordinance on the 24th day of January, 1881, amending and repealing certain ordinances, but still provided therein, "that all railroad companies or individuals laying or operating railroads within the City of Cleveland, should not only be subject to the conditions of the ordinance, but all and singular, future and further orders of the council in relation to such railroads."

The petition further avers that the Broadway & Newburg St. R. R. Co. accepted the provisions of the several grants made to it, and accepted the same subjcet to the terms and conditions thereof, and subject also to the provisions of said general ordinances of the city upon that subject; that since the consolidation of the companies as heretofore referred to the defendant company has owned and operated this particular line of road; that all of the ordinances were duly published as required by law; that in the grants under which the Broadway & Newburg St. R. R.. Co. built and constructed its railroads, it was provided that it should pave, or pay for the paying of, the space bewteen its rails.

The plaintiff further says, that on the 22nd day of December, 1890, the council of the city passed an ordinance to amend Section 981, of the revised ordinances of the City of Cleveland, relating to street railroad companies, which ordinance was duly published, and took effect in 10 days thereafter, and in and by said ordinance it was provided "that any individual, company or corporation to whom the privileges of this chapter have been, or may be granted by the city, shall be required to pave and keep in constant repair 16 feet for a double track, or 7 feet for a single track, all of which pavement shall be of the same material as the balance of the street is paved with, and shall be done to the acceptance of the board of improvements."

Again, on the 13th day of June, 1892, the council of the city passed an ordinance entitled, "An ordinance to drain, pave, curb and improve Broadway from the west curb line of Union Street to the southeasterly line of Miles Avenue," which ordinance was duly published, requiring the street to be paved with dressed block Medina sand stone, and improved in accordance with the grades, plans and profiles, etc., on file in

the chief enigneer's office, and that the Street Railroad Company owning and operating any street railroad upon any portion of said street between the points aforesaid should grade, pave and improve at its own expense a space 7 feet in width for a single track, and 16 feet in width for a double track, the work to be done under the direction, and to the satisfaction of the board of control of the city.''

The city further says, that in pursuance of said ordinance, all the steps to be taken on the part of the city precedent and subsequent thereto, have been duly taken and performed, and that the defendant,, although duly notified by the board of control and the director of public works, wholly refused and failed to pave any part of said street, excepting between the rails of its tracks being 10 feet in width on said street between the points named in the ordinance; and that by reason of the premises, said defendant was also required to pave in addition thereto the space between its two tracks, commonly called the "Devil's Strip," and one foot outside of the outer rail of each of its tracks, making in all 16 feet in width of said street between the points named in said ordinance, and that by reason of the failure of the defendant to comply with the ordinances of the city in that regard it was compelled to, and did pave at its own expense, the space between the tracks of said company, commonly called the "Devil's Strip," and one foot in width outside the outer rail of each of said tracks between the points named, which work it completed before the 13th day of February, 1884.''

The city further says, that for paving said space between said tracks, it expended and paid the sum of $11,016.14, and for paving said one foot in width outside the outer rail of each of said tracks it paid $5,332.37, making in all the sum of $16,448.20, for which amount it asks judgment against the defendant.

Such is the claim substantially as set forth by the City of Cleveland, to which claim the defendant files answer, and admits the corporate capacity of the plaintiff and itself; admits the consolidation of certain street railway companies; and among others the Broadway & Newburg St. R. R. Co., admits that it is bound and obligated by the same contracts and duties that the Broadway & Newburg St. R. R. Co. was prior to the consolidation; admits the construction of a railroad from Union Street to Miles Avenue, and says that it was under and by virtue of a contract with the City of Cleveland whereby said Broadway & Newburg St. R. R. Co. agreed to, and did pay for the paving between the rails of its tracks.

The defendant further says that that did not include the "Devil's Strip," nor any space outside of the rails between the points named. That such contract has been recognized by the city, and the defendant is at all times ready and willing to perform its contract, and has performed the same, which contract is fully embraced by the ordinance passed by the proper authority of the City of Cleveland, and accepted by the Broadway & Newburg St. R. R. Co. It denies that its contract has been in any respect changed by any proper authority, and that the contract existed at the time the paving mentioned in plaintiff's petition was done, and that it paid for its portion thereof, and is not indebted in any sum to plaintiff therefor; and then denies each and all allegations in plaintiff's petition contained not in its answer admitted, and asks to go hence with its costs.

It will be observed upon the statement of the issues as set forth by the petition and answer, that the question is largely, and in this case altogether, one of law. The question was fully heard by this branch of the court at the last term, and was extensively and very ably argued on both sides, and I am frank to say, has given to the court more concern and labor than any question that has been submitted to me during my services

upon the bench, and if I have correctly solved the problem, it has only been accomplished after a thorough examination of all authorities cited by counsel on both sides, as well as many examined by the court on its own motion.

The facts as to the amount of paving and the price of paving done by the city that it claims the defendant should pay for, are not disputed; that all the ordinances referred to and set forth in the petition were lawfully and legally passed, and the corporate capacity of both parties to the action, is not in controversy.

The question, therefore, arises upon the right of the city under the ordinances referred to, and by the ordinance of December 22, 1890, and June 13, 1892, to impose upon the defendant or the Broadway & Newburg St. R. R. Co. the further burden of paving, or paying for the paving of the space between its tracks commonly called the "Devil's Strip," and being four feet in width, together with one foot on the outside of the outer rail of its tracks. Such a right the plaintiff insists on its part does exist; whilst the defendant contends that no such power resides in the municipality, for the reason that its contract, or the contract of the Broadway & Newburg St. R. R. Co., under all the ordinances or grants made by the city prior to, and up to December 22, 1890, required only of the Broadway & Newburg St. R. R. Co. that it would pave the space between its tracks; that it accepted its franchise, built its road, has and still does maintain the same upon the express condition and contract relation that that was all the space to be by it paved and kept in repair or paid for; and it contends that any attempt, either on the part of the legislature through the City of Cleveland, or by either body direct, to impose the further burden of paving sixteen feet, is to impair its contract obligation, and, therefore such act or attempt by ordinance, or by the legislature, is wholly null and void, and in violation of the defendant's constitutional rights.

This brings us to the consideration at once of the ordinances of the city, statutes of the state, and the constitutional reservation upon the subject of corporate powers, or charters.

I first desire to say, however, that several terms ago substantially the same question was presented to another branch of this court, to-wit, Judge Hamilton, which arose upon a question entirely different from the one made here. In that case an application was made for injunction; and in passing upon that application the judges met and considered the question pending in this action, but it was not the leading question of the case. But so far as any holding was made upon the subject, it was to the effect that it was an impairment of the contract obligations, and therefore such additional burdens could not be imposed, although I am frank to say, were the same application now pending before me for injunction, I would feel constrained to do and hold as Judge Hamilton did in reference to the injunction. The question, however, being made and presented in this case, I have consulted with Judge Hamilton, and after a careful examination of the entire subject, I may say that I think he is substantially in accord with the opinion in this case. *

It will be observed that under the ordinances of the City of Cleveland passed on the 4th day of December, 1866, the provisions of Section 13 were to the effect, and in express language provided that any individual or company to whom was granted the privilege of laying down rails for running street passenger cars, to be drawn by horses or mules through the streets of the City of Cleveland, should perform all and singular the conditions of the general ordinance, together with all and singular the future and further orders of the council in relation to said street railroads. Also

by the terms and conditions of the grant made to the Broadway & New-burg St. R. R. Co. on July 27th, 1875, wherein it was specifically provided that the company should pave the space within the rails of each of its tracks and turn-outs, whenever the City Council should deem it necessary, etc.; that the company would peform all and singular the conditions of that ordinance, together with all and singular further and future orders of the council in relation to said railroad, and if they failed to do so, then the privilege should be null and void.

Again, by the ordinance of the 15th of October, 1883, the same provisions were set forth in said ordinance with reference to the extensions therein provided for. That grant ran for a period of twenty years, but in accordance with the holding of our Circuit Court in the case of the State, ex rel. etc., v. The East Cleveland Railroad Co., 6 C. C. 318, it was held that it was "within the power of a street railroad company, and the City Council, by agreement, to terminate the first grant at any time previous to its expiration, when there was good cause for so doing, and to renew the grant for any period not in excess of the limitation fixed by statute."

Hence the ordinance of July 1st, 1889, granting permission to the Broadway & Newburg St. R. R. Co. to operate its entire lines and extensions by electricity for a period of twenty-five years, included a nd imposed upon the railroad company the same burdens and contract obligations that existed under the original grant, together with the stipulation that nothing in the ordinance of July 1st, 1889, should in any wise release or relieve the company from compliance with all other ordinances relating to street railroads then in force, or which might thereafter be adopted by the City Council, including all amendments hereto and thereto. So the railroad company was operating its road at the time the city undertook by ordinance to increase its burdens under the ordinance of July 1st, 1889. That being true, the only requirement at that time or at any time of the railroad company with reference to paving was that it should pave the space within the rails of its tracks.

On the 21st day of April, 1890, the legislature of Ohio, then in session, provided by statute as follows as an amendment to Section 2,504 of the Revised Statutes.

"That in cities of the second grade of the first class the council may require of any street railroad company to pave and keep in constant repair sixteen feet for a double track or seven feet for a single track, all of which pavement shall be of the same material as the balance of the street is paved with." After the passage of this act the City Council enacted the ordinances of December 22, 1890, and June 13th, 1892, and by the ordinance of December 22nd, 1890, predicated upon the act of the legislature of April 21st, 1890, it provided, "that any individual, company or corporation to whom the privileges of this chapter have been, or may be granted by the city, shall be required to pave and keep in constant repair, sixteen feet for a double track, or seven feet for a single track, all of which pavement shall be of the same material as the balance of the street is paved with, whenever the City Council shall so order, etc."

Now, it is contended as I have said, that the ordinance just referred to of December 22nd, 1890, undertakes to impose a greater burden than that provided for by the original grant or contract between the railroad company and the city, and therefore impairs the obligation of its contract, and is void and of no effect. In the examination of this question, I have carefully canvassed all the authorities referred to by counsel, as well as many found and examined by the court, and among others referred to by counsel is that of the 138 U. S. Reports, page 98. The case

of Sioux City Street R. R. Co. v. Sioux City, submitted to the Supreme Court of the United States, and decided January 26, 1891, the syllabus of which case is as follows: "On December 12th, 1883, the City of Sioux City in Iowa, by ordinance, conferred on a street railroad company, incorporated December 6, 1883, under the general laws of Iowa, the right of operating a street railway with the requirement that it should pave the street between the rails." Subsequently, under an act of 1884, the city, by ordinance, required the company also to pave the street for one foot outside of the rails, and assessed a special tax against it for the cost of the paving outside of the rails. Held, that there was no contract between the company and the state or the city, the obligation of which was impaired by the laying of the tax." Under Section 1,090 of the Code of Iowa, which was in force when the company was incorporated, its franchise was subject to such conditions as the legislature should thereafter impose as necessary for the public good.

Justice Blatchford, after stating the case, delivered the opinion of the court, and without quoting the entire opinion, the judge says that the company took its franchise subject to such legislation as the state might enact, which is plain from the provisions of Section 1,090 of the code. The company took its charter subject to the provisions of that section. Under Section 1,090 of the Iowa Code, the legislature had the power, not only to repeal and amend the articles of incorporation of the company, but to impose any conditions upon the enjoyment of its franchise, which the general assembly might deem necessary for the public good. The reservation of this power was a condition of the grant. The judge further says: "Moreover, the city derived from the state alone its power to grant a license to the company; the right to operate a railway in the streets is a franchise obtained through power given to the city by the state, but the state reserves the power to regulate and impose conditions upon it. It reserves the power to determine the question of the exemption of the company from taxation, and to prescribe what burdens should be imposed upon it for the public good in the enjoyment of its franchise, and the case is not changed by the fact that the franchise was granted by the city." And then he says, "No question can arise as to the impairment of the obligations of a contract when the company accepted all of its corporate powers, subject to the reserve power of the state to modify its charter, and to impose additional burdens upon the enjoyment of the franchise."

It may well be said, however, in this case, that the state under the code reserved to itself the right to exercise the power of imposing further burdens, and that Section 1,090 of the code being in existence at the time of the original grant to the company, was read into the contract or grant, and became a part thereof, and therefore it did reserve to itself, the legislature, the right to require the further duty or burden of paving one foot on the outer side of each rail of its track.

We do not think that this case is on all fours with the one at bar, and yet the principles enunciated in this decision by the highest tribunal in this, or any other country, would seem to rest upon the doctrine that when the railroad company accepted its franchise, it accepted it under the then existing provisions of the Code of Iowa, and could not be heard to say that when the legislature undertook to exercise that reserve power, that it was impairing the contract of which the reserve power was itself a part. It is true that we have no such code provision, but we do have in the organic law of the state, a provision that is equally as broad, and by a construction given it by the Supreme Court of the United States, even broader in its meaning and scope than the language used in the Iowa

Code. I refer to Section 2 of Article 1 of the bill of rights, which provides all political power is inherent in the people ; government is instituted for their equal protection and benefit, and they have the right to alter, reform or abolish the same whenever they may deem it necessary, and no special privileges or immunities shall ever be granted that may not be altered, revoked or repealed by the general assembly.''

Under the constitution then of 1851, the act or charter of the incorporation of the Broadway & Newburg St. R. R. Co. was granted and read into it, and as a part thereof was the reserved power in the people of the state to do what? To alter, revoke or repeal its charter. This, however, means the exercise of that reserve power always in a reasonable manner and never arbitrarily. How do the people enforce this reserve power thus provided for in the constitution? Clearly through its legislators; and the legislature in part, not only grants, as in the case at bar, privileges to corporations and individuals through the different municipalities of the state, but it, by direct acts, authorizes the municipalities to perform and do all things that the city may lawfully do in the way of municipal or self government. Hence the legislature of Ohio, on the 21st day of April, 1890, by act, said to the authorities of the City of Cleveland, that by virtue of the reserve power under the constitution of the state, and by virtue of the power vested in the legislature, it might under and in keeping with the power so reserved under the constitution, require of the Broadway & Newburg St. R. R. Co. the paving of sixteen feet of the street in which it operates its railroad, instead of ten feet as originally named in the original grant, for the reason that when they received their charter of incorporation, and, further when they accepted all the privileges that had been granted them, they expressly agreed that they accepted the same subject, not only to the provisions of the constitution on that subject, but subject to the express language of the ordinances as provided therein.

It is now contended by the defendant that because of the exercise of this power by the legislature, or by the legislature through the City of Cleveland by its ordinances, it is an impairment of the very contract of which the constitutional reservation, as well as all the ordinances are read into, and made a part thereof. We think, upon reasoning, the authorities conclusive that such a position on the part of the railroad company is not tenable. If it is contended that the language used in the constitution is not sufficiently broad, or the language used in the ordinances creating the reservations, then I call attention to the language of the Supreme Court of the United States upon that subject found, in Volume 146, page 269, wherein the Supreme Court says, ''that by the constitution of Ohio, adopted in 1851, it was declared that no special privileges or immunities shall ever be granted that cannot be altered, revoked or repealed by the General Assembly.''

Further on, Justice Harlan, delivering the opinion, speaking of the reserved power in the statutes of Massachusetts which provide ''that every act of incorporation passed after a named day, shall be subject to amendment, alteration or repeal at the pleasure of the legislature,'' the court says the words ''at the pleasure of the legislature'' are not in the clause of the constitution of Ohio, or in the statutes to which we have referred, but the general reservation of the power to alter, revoke or repeal the grant of special privileges, necessarily implies that the power may be exercised at the pleasure of the legislature.

Hence, if I am right in the conclusion reached, and the construction given to the act of the legislature and the ordinances of the City of Cleveland, there is but one question remaining, and that is: was the legislature

of Ohio authorized, and did it have power to authorize the City of Cleveland, by act, to impose the additional burden referred to in this case?

This question gave to the court a good deal of consideration, and a great deal of examination of authorities upon that subject, but a careful study and review of the authorities convinces me that the legislature of Ohio had the right by statute directly to impose this burden upon the Broadway & Newburg St. R. R. Co., or it had the right, as it did, to authorize the municipality of the City of Cleveland to impose that burden, it, the City of Cleveland, having granted the privilege by authority from the state, and the defendant company having accepted the privileges, that the reservation not alone in the constitution, but in the ordinance itself, was that the state could, and it did, by and through the City of Cleveland, lawfully impose the burden. And on this subject I refer to the 18th Ohio State Reports, page 298, in the case of the State, ex rel. etc. v. The Cincinnati Gas Light & Coke Co. Judge Scott delivering the opinion, says: "That the defendant's charter is a special one granted in 1837, and contains a provision expressly subjecting it to alterations, modifications or repeal by any future legislation." This, of course, was before the constitution of 1851. The judge says: "It is claimed on behalf of the defendant that the reserved power of alteration, modification or repeal can be exercised only by the legislature, and cannot be delegated to a City Council." In further referring to the question, he says, "It is the legislative act which prescribes the rule of corporate action, though the City Council is made an agent in its administration." And in the syllabus of the same case it is said, "The right of such use of the public streets of a city is a franchise, and must emanate either directly or indirectly from the legislature." So, also, in the case of the 138th U. S. Reports, it will be observed, "that the City Council, by ordinance, required and imposed the additional burden of paving one foot outside the rail." And in that case the city granted to the street railway company the privilege of laying its tracks in the street. Hence, on this question I have no doubt that the legislature of Ohio could just as well impose this burden through the City of Cleveland through which the privilege had been granted, as to do it itself direct.

*Lawrence, Estep, Weh & Henry*, for plaintiff.
*Squire, Sanders & Dempsey*, for defendant.